**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **TARGET CORPORATION, et al.,** |  |
| Plaintiffs, | **No. 13-CV-03477 (AKH)** |
| v. |  |
| **VISA INC., VISA U.S.A. INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, AND MASTERCARD INTERNATIONAL INCORPORATED,** | **ORAL ARGUMENT REQUESTED** |
| Defendants. |  |

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

PROCEDURAL BACKGROUND.......................................................................................3

A.   In the *Visa Check* Case, Nationwide Merchant Classes Released Past, Present, and Future Claims Based on Defendants' Network Rules in Existence Before 2004 ...........................................................................................3

B.   In the *Payment Card* Case, the Court Dismissed as Released in *Visa Check* New Merchant Claims That Sought Damages Incurred Prior to 2004 Based on Defendants' Network Rules in Existence Before 2004 ...................................6

C.   After the *Payment Card* Case Settled, Merchant Opt Outs Filed This Action Also Claiming Damages Based on Defendants' Network Rules in Existence Before 2004 ...........................................................................................8

ARGUMENT .....................................................................................................................10

I.   AS IN *PAYMENT CARD*, PLAINTIFFS' CLAIMS SHOULD BE DISMISSED UNDER THE *VISA CHECK* RELEASE TO THE EXTENT THAT THEY SEEK DAMAGES INCURRED PRIOR TO JANUARY 1, 2004, BECAUSE THOSE CLAIMS ARE BASED ON DEFENDANTS' NETWORK RULES IN EXISTENCE BEFORE 2004....................................................10

II.  PLAINTIFFS' CLAIMS SEEKING DAMAGES SINCE JANUARY 1, 2004 ALSO SHOULD BE DISMISSED UNDER THE *VISA CHECK* RELEASE, BECAUSE THOSE CLAIMS LIKEWISE ARE BASED ON DEFENDANTS' NETWORK RULES IN EXISTENCE BEFORE 2004........................11

CONCLUSION..................................................................................................................15

# TABLE OF AUTHORITIES

Page

**Cases**

*Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,*
369 F.3d 212 (2d Cir. 2004) ...........................................................................................................4

*Crivera v. City of N.Y.,*
No. 03-CV-447, 2004 WL 339650 (E.D.N.Y. Feb. 23, 2004) ...........................................15

*In re Drexel Burnham Lambert Group,*
960 F.2d 285 (2d Cir. 1992)...............................................................................................4

*Kramer v. Time Warner Inc.,*
937 F.2d 767 (2d Cir. 1991)...............................................................................................4

*Hunter Douglas, Inc. v. Comfortex Corp.,*
No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) ..................14

*Madison Square Garden, L.P. v. National Hockey League,*
No. 07-CV-8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008)................................12, 13

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.,*
161 F.3d 443 (7th Cir. 1998) ............................................................................................14

*In re Payment Card Interchange Fee and Merchant Discount Fee Antitrust Litigation,*
No. 05-MD-01720, 2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) ......................2, 6, 7, 10, 11

*Record Club of Am., Inc. v. United Artists Records, Inc.,*
611 F. Supp. 211 (S.D.N.Y. 1985) ....................................................................................14

*Reidy v. Runyon,*
971 F. Supp. 760 (E.D.N.Y. 1997) ....................................................................................15

*Shane v. Humana, Inc.,*
No. 00-MD-1334, 2009 WL 7848518 (S.D. Fla. Nov. 5, 2009) *adopted*, 2009 WL
7848638 (S.D. Fla. Dec. 1, 2009) .....................................................................................14

*In re Visa Check/MasterMoney Antitrust Litigation,*
192 F.R.D. 68 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001) ...................................3

*In re Visa Check/MasterMoney Antitrust Litigation,*
297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa
USA. Inc.,* 396 F.3d 96 (2d Cir. 2005) .............................................................................5, 6

*VKK Corp. v. Nat'l Football League,*
244 F.3d 114 (2d Cir. 2001).......................................................................................12, 13

*Wal-Mart Stores, Inc. v. Visa USA. Inc.,*
 396 F.3d 96 (2d Cir. 2005)............................................................................................6, 7

*Willsea v. Theis,*
 No. 98-CV-6773, 1999 WL 595629 (S.D.N.Y. Aug. 6, 1999)..........................................13

## PRELIMINARY STATEMENT

Defendants MasterCard Incorporated and MasterCard International Incorporated ("MasterCard"), and defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association ("Visa") (collectively, "Defendants"), submit this memorandum in support of their motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint[1]. All of plaintiffs' claims are barred because they are based on MasterCard and Visa network rules that were the subject of releases plaintiffs previously provided years ago in class settlements with MasterCard and Visa. Because those settlements, as well as the court's orders and judgments finally approving them, confer exclusive jurisdiction on Judge Gleeson of the Eastern District of New York to determine the applicability of the releases to subsequent actions, MasterCard and Visa also are filing a motion to stay this action pending resolution of their application to Judge Gleeson to proceed with that determination.

Plaintiffs are merchants who have accepted MasterCard and Visa payment cards and who therefore are members of classes certified in *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-CV-05238 (E.D.N.Y.) (Gleeson, J.) (Orenstein, M.J.) ("*Visa Check*"). When the *Visa Check* case settled in 2003, the merchant classes released all claims against MasterCard and Visa that related to conduct prior to January 1, 2004 that was or could have been challenged in that case, including MasterCard's and Visa's respective network rules in existence by that date.

Two years after releasing those claims in exchange for billions of dollars in settlement funds, merchants began filing new class actions against MasterCard and Visa, based on their respective "default interchange," "honor all cards," "no discount," "no surcharge," "all outlets," and other network payment card acceptance rules. The Judicial Panel on Multidistrict Litigation

---

[1] A copy of the complaint is attached hereto as Exhibit 1.

transferred those actions to Judge Gleeson as MDL 1720 for coordinated and consolidated pretrial proceedings in *In re Payment Card Interchange Fee and Merchant Discount Fee Antitrust Litigation*, 05-MD-01720 (E.D.N.Y.) (Gleeson, J.) (Orenstein, M.J.) ("*Payment Card*").

Defendants moved to dismiss the *Payment Card* merchants' claims for damages incurred prior to January 1, 2004 as released by the prior *Visa Check* class settlements.   Judge Gleeson adopted Magistrate Judge Orenstein's report and recommendation granting that motion.   The court held that the network rules on which the *Payment Card* merchants' new claims were based "plainly relate to the factual predicate of the *Visa Check* litigation" that had been released.   *In re Payment Card Interchange Fee and Merchant Discount Fee Antitrust Litig.*, No. 05-MD-1720, 2008 WL 115104, at *11 (E.D.N.Y. Jan. 8, 2008).

The *Payment Card* merchants then filed an amended complaint, still challenging the same MasterCard and Visa network rules and seeking damages incurred subsequent to January 1, 2004.   Defendants moved to dismiss that complaint because it was based on the continuation of network rules in existence prior to January 1, 2004, which were part of the released factual predicate in the *Visa Check* case.   That motion was fully briefed and argued to Judge Gleeson, but the *Payment Card* litigation settled before he decided the motion.

Plaintiffs here opted out from the *Payment Card* settlement class that sought past damages and now assert, in this case, damages claims based on the same MasterCard and Visa network rules previously challenged by the *Payment Card* merchants.   Therefore, consistent with Judge Gleeson's holding in *Payment Card*, plaintiffs' claims should be dismissed as barred by the *Visa Check* releases to the extent that they seek damages incurred prior to January 1, 2004. *See* Section I *infra*.   Plaintiffs' claims for damages incurred since January 1, 2004 likewise should be dismissed, because those claims are based on the same MasterCard and Visa network rules that formed part of the pre-January 1, 2004 factual predicate that was released in *Visa*

*Check*.  That result is fully supported by case law holding that a settlement properly releases claims based on the future continuation of a defendant's conduct that was in existence prior to the settlement and within the factual predicate of the settled action.  *See* Section II *infra*.

For these reasons, plaintiffs' complaint should be dismissed in its entirety.

## PROCEDURAL BACKGROUND

A.      **In the *Visa Check* Case, Nationwide Merchant Classes**
        **Released Past, Present, and Future Claims Based on**
        **Defendants' Network Rules in Existence Before 2004**

Led by Wal-Mart Stores, a putative class of merchants across the United States sued MasterCard and Visa in 1996, in what became the *Visa Check* litigation.  The merchants asserted that Visa and MasterCard each restrained trade in violation of the antitrust laws through their respective network card acceptance rules, including their "honor all cards" and interchange rules.  *See In re Visa Check/MasterMoney Antitrust Litig.,*, 192 F.R.D. 68, 72-73 (E.D.N.Y. 2000), *aff'd*, 280 F.3d 124 (2d Cir. 2001), *cert. denied*, 536 U.S. 917 (2002).  The MasterCard and Visa network rules allegedly resulted in merchants paying excessive fees for accepting consumers' MasterCard and Visa card payments.  *See* 192 F.R.D. at 72-73.  In 2000, Judge Gleeson certified two classes, under both Rule 23(b)(2) and (3), of "all persons and business entities who have accepted Visa and/or MasterCard credit cards and have therefore been required to accept [Visa or MasterCard] debit cards . . . ."  *Id.* at 88-90.

In 2003, MasterCard and Visa each entered into a separate class settlement with settlement classes comprised of merchants that accepted MasterCard or Visa cards up to June 2003.  *See* Settlement Agreement at ¶ 1(c)(e), *In re Visa Check*, 2005 WL 6054266 (E.D.N.Y. Mar. 28, 2005) (No. 96-CV-5238) [MasterCard Settlement] and Settlement Agreement at ¶ 1(c)(e), *In re Visa Check*, 2005 WL 6054267, (E.D.N.Y. Mar. 28, 2005) (No. 96-CV-5238)

[Visa Settlement].[2]   MasterCard and Visa agreed to pay the class merchants a total of approximately $3 billion, to modify their respective "honor all cards" and other network card acceptance rules, and to reduce debit interchange fees.  *See id.*, 2005 WL 6054266 [MasterCard Settlement] ¶¶ 3-9 and 2005 WL 6054267 [Visa Settlement] ¶¶ 3-9.

In return, the settling classes released MasterCard and Visa from all past, present, or future claims relating in any way to their respective network rules prior to January 1, 2004 that were or could have been alleged in *Visa Check*.  Specifically, the releases extended to:

> all manner of claims, demands, actions, suits, causes of action . . . whether class, individual, or otherwise in nature, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, in law or equity, that any [merchant class member] ever had, ***now has, or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004*** concerning any claims alleged in the Complaint or any of the complaints consolidated therein, ***including, without limitation, claims which have been asserted or could have been asserted in this litigation*** which arise under or relate to any federal or state antitrust, unfair competition, unfair practices, or other law or regulation, or common law, including, without limitation, the Sherman Act, 15 U.S.C. § 1 et seq.

*Id.*, 2005 WL 6054266 [MasterCard Settlement] ¶ 30 and 2005 WL 6054267 [Visa Settlement] ¶ 28 (emphasis added).  Furthermore, each merchant class member "covenant[ed] and agree[d] that it shall not, hereafter, seek to establish liability against" MasterCard or Visa "based, in whole or in part, upon any of the [r]eleased [c]laims."  *Id.*

Each settlement further provided that the merchant class members "irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of New York for any suit, action, proceeding or dispute arising out of or relating to this Settlement Agreement

---

[2]   In adjudicating a motion to dismiss under Rule 12(b)(6), the Court may consider the allegations in the complaint as well as documents in the public record, such as court filings in other actions.  *See, e.g.*, *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004).  The Court also may "consider matters of which judicial notice may be taken under Fed. R. Evid. 201," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991), which include a settlement agreement, *see, e.g.*, *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 289 n.2 (2d Cir. 1992).

or the applicability of this Settlement Agreement," and that "[a]ll applications to the Court with respect to any aspect of the Settlement shall be presented to and determined by United States District Judge John Gleeson . . . ."  *Id.*, 2005 WL 6054266 [MasterCard Settlement] ¶ 41(a) and 2005 WL 6054267 [Visa Settlement] ¶ 39(a).  Moreover, "[i]n the event that the provisions of this Settlement Agreement are asserted by [MasterCard or Visa] as a defense in whole or in part to any claim or cause of action . . . in any other suit, action or proceeding," it was "agreed that [MasterCard or Visa] shall be entitled to a stay of that suit, action or proceeding until the United States District Court for the Eastern District of New York has entered an order or judgment determining any issues relating to the defense . . . based on such provisions."  *Id.*, 2005 WL 6054266 [MasterCard Settlement] ¶ 41(b) and 2005 WL 6054267 [Visa Settlement] ¶ 39(b).  In his orders and final judgments approving the settlements, Judge Gleeson therefore "retain[ed] exclusive jurisdiction" for any "dispute arising out of or relating to" the settlements, specifically including "any dispute concerning the provisions of [the release]" when "asserted as a defense in whole or in part to any claim or cause of action."  Order and Final Judgment at ¶ 15, *In re Visa Check*, No. 96-CV-5238 (E.D.N.Y. Jan. 30, 2004) Dkt. No. 980 and Order and Final Judgment at ¶ 16, *In re Visa Check*, No. 96-CV-5238 (E.D.N.Y., Jan. 30, 2004) Dkt. No. 979.

Judge Gleeson granted final approval of the *Visa Check* class settlements, noting that they reflected the "culmination of approximately seven years of litigation, and represent[ed] the largest antitrust settlement in history."  *In re Visa Check*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96 (2d Cir. 2005), *cert. denied*, 544 U.S. 1044 (2005).  Judge Gleeson found that the class settlement releases could properly extend to claims that "arise from the same set of facts," specifically including claims that "interchange fees are artificially (and anticompetitively) high because of the concerted activity of Visa and MasterCard" with respect to their "honor all cards" and other network rules.

- 5 -

297 F. Supp. 2d at 513.  He concluded that "in exchange for an unprecedented amount of compensatory damages, plaintiffs here have released all claims based on the mix of facts that produced anticompetitive intercha[n]ge rates." *Id.* at 514.

The Second Circuit affirmed Judge Gleeson's final approval of the class settlements and their releases.  *See* 396 F.3d at 106-09, 124.

**B.      In the *Payment Card* Case, the Court Dismissed as Released in *Visa Check* New Merchant Claims That Sought Damages Incurred Prior to 2004 Based on Defendants' Network Rules in Existence Before 2004**

Just two years after the *Visa Check* settlement, merchants began filing new class actions against MasterCard and Visa, which were transferred to Judge Gleeson as MDL 1720 and consolidated for coordinated pretrial proceedings in *Payment Card*.  The merchants in those actions again claimed that MasterCard and Visa fixed fees for accepting MasterCard and Visa cards through network "default interchange" rules.  *See*, *e.g.*, Second Consolidated Am. Class Action Compl. at ¶¶ 148-177, *In re Payment Card*, No. 05-MD-1720 (S.D.N.Y. Feb. 20, 2009) Dkt. No. 1153.  The merchants also again claimed that the MasterCard and Visa "honor all cards" and other payment acceptance rules — including "no surcharge," "no discrimination" or "no discount," and "all outlets" rules — unlawfully restrained trade in violation of the antitrust laws.  *See*, *e.g.*, *id.* ¶¶ 1(c)-(d)(m)(s)(v)-(y), 189-199, 288.  The merchants claimed that those network rules inflated interchange fees and thereby increased the fees that the merchants paid for accepting consumers' MasterCard and Visa card payments.  *See*, *e.g.*, *id.* ¶¶ 246-248.

Defendants moved to dismiss the merchants' new claims for damages incurred prior to January 1, 2004 as barred by the *Visa Check* class settlement releases.  *See Payment Card*, 2008 WL 115104, at *1.  Judge Gleeson referred the motion to Magistrate Judge Orenstein for a report and recommendation.  Magistrate Judge Orenstein found that the proposed classes, of "'[a]ll persons, businesses, and other entities that have accepted Visa and/or MasterCard Credit and/or

Debit Cards in the United States,'" were acknowledged to be "'virtually identical to'" the classes "previously certified in the *Visa Check* litigation." *Id.* at *2 (citation omitted). Turning to what claims those merchants had released in *Visa Check*, Magistrate Judge Orenstein noted that "[t]aken as a whole, the [*Visa Check*] Settlement reflects a bargain that is both carefully calibrated in its details and intentionally broad in scope: in return for relief that marked the Settlement as 'the largest in the history of antitrust law,' . . . the *Visa Check* plaintiff class had released Visa and MasterCard from liability for all conduct up through the end of [2003]." *Id.* at *10 (quoting *Wal-Mart Stores, Inc.*, 396 F. 3d at 101).

Magistrate Judge Orenstein then concluded that the merchant plaintiffs were barred from pursuing "all claims arising out of conduct occurring before January 1, 2004 related to the claims at issue in the *Visa Check* litigation." *Id.* at *11. Those released claims included all claims based on the MasterCard and Visa interchange fees and network card acceptance rules challenged in *Payment Card*, because the merchant plaintiffs

> [sought] damages for harms they allegedly suffered due to concerted activity among the defendants that violated federal antitrust law. They complain[ed] about the agreements into which the defendants entered, the exclusionary rules they implemented, and the supracompetitive interchange fees they charged. ***The factual allegations on which those complaints are predicated plainly relate to the factual predicate of the Visa Check litigation***, which included the nature and extent of defendants' collaboration, the effect of any such collaboration on competition and interchange fees, and the resulting harm to merchants in the plaintiff class.

*Id.* (emphasis added) (citation omitted). Magistrate Judge Orenstein accordingly recommended that Judge Gleeson "grant in full the defendants' motion to dismiss the Class Plaintiffs' claims for damages to the extent that those damages were incurred prior to January 1, 2004." *Id.* at *16. Judge Gleeson adopted that recommendation. *See id.* at *1.

The *Payment Card* merchants subsequently amended their class complaints, and defendants again moved to dismiss. This time, defendants moved to dismiss plaintiffs' claims

based on damages incurred since January 1, 2004, because Judge Gleeson had found the network rules on which the merchants based their claims to have been part of the factual predicate of the *Visa Check* case in existence when that case settled in 2003. The enactment and implementation of those network rules constituted "conduct prior to January 1, 2004" concerning claims "which have been asserted or could have been asserted" in *Visa Check*, and thus were covered by the *Visa Check* settlement releases. *Visa Check*, 2005 WL 6054266 [MasterCard Settlement] ¶ 30 and 2005 WL 6054267 [Visa Settlement] ¶ 28. Defendants' motion was fully briefed and argued, but the case settled before Judge Gleeson ruled, and the motion was deemed withdrawn without prejudice to reinstatement if the settlement was not consummated. *See* Mem. of Law in Supp. of Mot. to Dismiss Second Consolidated Am. Class Action Compl. at 4-11, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. Mar. 31, 2009) Dkt. No. 1172; Class Pls.' Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Second Consolidated Am. Class Action Compl. at 3-11, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. June 2, 2009) Dkt. No. 1226; Reply Mem. of Law in Support of Mot. to Dismiss Second Consolidated Am. Class Action Compl. at 1-6, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. July 2, 2009) Dkt. No. 1245; and Order, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. July 17, 2012).[3]

## C. After the *Payment Card* Case Settled, Merchant Opt Outs Filed This Action Also Claiming Damages Based on Defendants' Network Rules in Existence Before 2004

The class settlement in *Payment Card* provided for the certification of two settlement classes. The first class was a Rule 23(b)(3) Settlement Class of merchants that accepted Visa or MasterCard cards from January 1, 2004 to the settlement preliminary approval date; that class sought compensation for past damages, and opt outs from the class were permitted. *See*

---

[3] Defendants also moved to dismiss the complaints on other grounds, and moved for summary judgment on a number of grounds. All of those motions were fully briefed when the settlement was approved.

Definitive Class Settlement Agreement at ¶¶ 2(a), 28-30, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. Oct. 19, 2012) Dkt. No. 1656.  The second class was a Rule 23(b)(2) Settlement Class of merchants that as of the settlement preliminary approval date accepts or in the future will accept Visa or MasterCard cards; that class sought prospective modifications of Visa and MasterCard network rules, and opt outs were not permitted from that class.  *See id.* ¶¶ 2(b), 39, 40-65.  The release provided by the (b)(2) class permitted merchants who opted out of the (b)(3) class to assert claims for damages incurred up to the settlement preliminary approval date.  *See id.* ¶ 68.  Judge Gleeson preliminarily approved the *Payment Card* class settlement and certified the two settlement classes on November 27, 2012.  *See* Class Settlement Preliminary Approval Order at ¶¶ 3, 5-6, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. Nov. 27, 2012) Dkt. No. 1745.  The final approval hearing is scheduled for September 12, 2013.  *See id.* ¶ 27.

Target and the other plaintiffs in this case are merchants who opted out of the (b)(3) class in order to seek past damages up through the preliminary approval date of November 27, 2012.  *See* Compl. at ¶ 42, May 23, 2013, Dkt. No. 1.  They challenge the same MasterCard and Visa network rules challenged by the merchants in *Payment Card*, and advance the same claim that those rules inflated interchange fees, and thereby the fees that merchants paid for accepting consumers' MasterCard and Visa card payments, in violation of the antitrust laws.  As plaintiffs allege:

> The principal rules that constitute the Competitive Restraints [challenged in this case] are the setting of "default" interchange fees, the Honor All Cards Rules, the All Outlets Rules, the No Discount Rules, and the No Surcharge Rules.  These rules, individually and in combination, preclude merchants from gaining the benefits of competition as to the terms, including a fee (if any), for the acceptance of cards of particular issuing banks and preclude card issuers from competing for merchant acceptance of their cards.  As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at a supracompetitive level.  Plaintiffs have paid and continue to pay significantly higher costs to accept Visa-branded and MasterCard-branded credit and debit cards than

- 9 -

they would if the banks issuing such cards competed for merchant acceptance.

*Id.* ¶ 6; *see also*, *e.g.*, *id.* ¶¶ 73-90, 132-177.

## ARGUMENT

The class settlement releases in *Visa Check* bar plaintiffs' claims in this case in their entirety.  Moreover, because under the settlements and the orders and final judgments in *Visa Check* Judge Gleeson retained exclusive jurisdiction to determine the applicability of these releases to subsequent actions, MasterCard and Visa will make an application to Judge Gleeson – – as they are required to do — to determine that threshold issue in this case.

I.    **AS IN *PAYMENT CARD*, PLAINTIFFS' CLAIMS SHOULD BE DISMISSED UNDER THE *VISA CHECK* RELEASE TO THE EXTENT THAT THEY SEEK DAMAGES INCURRED PRIOR TO JANUARY 1, 2004, BECAUSE THOSE CLAIMS ARE BASED ON <u>DEFENDANTS' NETWORK RULES IN EXISTENCE BEFORE 2004</u>**

It is undeniable that plaintiffs' opt out claims in this case are based on the same MasterCard and Visa network rules and fees challenged by the merchant class in *Payment Card*. Both complaints claim that the network "default interchange," "honor all cards," "no surcharge," "no discrimination" or "no discount," and "all outlets" rules unlawfully restrained trade and inflated interchange fees in violation of the antitrust laws.  *Compare*, *e.g.*, Compl. at ¶¶ 6, 132-177, *with* Second Consolidated Am. Class Action Compl. at ¶¶ 1(c)-(d)(m)(s)(v)-(y), 148-177, 189-199, 246-248, 288, *In re Payment Card* (E.D.N.Y. Feb. 20, 2009) Dkt. No. 1153.

Judge Gleeson, who has exclusive jurisdiction to determine the applicability of the *Visa Check* class settlement releases, already has concluded that the releases bar those claims with respect to damages incurred prior to January 1, 2004.  He approved Magistrate Judge Orenstein's report and recommendation concluding that the "plain language" of the releases "extinguishes any claim that could be asserted by a *Visa Check* class member against Visa and MasterCard if

- 10 -

that claim related to the *Visa Check* claims, regardless of whether such claims were actually asserted in the complaint. . . ." *Payment Card*, 2008 WL 115104, at *10. The MasterCard and Visa network rules challenged in the *Payment Card* complaint — and plaintiffs' complaint in this case —"plainly relate to the factual predicate of the *Visa Check* litigation. . . ." *Id.* at *11. As in *Payment Card*, "under any fair reading of the relevant pleadings and the Settlement," claims for damages incurred prior to January 1, 2004 "fall within the scope of the Settlement's release of claims 'relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the [*Visa Check*] Complaint.'" *Id.* (quoting *Visa Check*, 2005 WL 6054266 [MasterCard Settlement] ¶ 30 and 2005 WL 6054267 [Visa Settlement] ¶ 28).

Accordingly, plaintiffs' claims in this case should be dismissed insofar as they seek damages incurred prior to January 1, 2004.

## II. PLAINTIFFS' CLAIMS SEEKING DAMAGES SINCE JANUARY 1, 2004 ALSO SHOULD BE DISMISSED UNDER THE *VISA CHECK* RELEASE, BECAUSE THOSE CLAIMS LIKEWISE ARE BASED ON DEFENDANTS' NETWORK RULES IN EXISTENCE BEFORE 2004

In addition, the *Visa Check* settlement releases bar plaintiffs' claims for damages incurred after January 1, 2004. In dismissing the *Payment Card* plaintiffs' claims for damages incurred prior to January 1, 2004 based on the same MasterCard and Visa network rules challenged in this case, Judge Gleeson and Magistrate Judge Orenstein concluded that those network rules "plainly relate to the factual predicate of the *Visa Check* litigation" that was in existence prior to January 1, 2004. *Payment Card*, 2008 WL 115104, at *11. Thus, the releases also bar plaintiffs' claims based on those network rules for damages incurred since January 1, 2004, because they also relate to that factual predicate. As the releases state, they extend to all claims that any plaintiff "ever had, now has or ***hereafter can, shall or may have, relating in any way*** to any conduct prior to January 1, 2004. . . ." *Visa Check*, 2005 WL 6054266 [MasterCard Settlement] ¶ 30 and

2005 WL 6054267 [Visa Settlement] ¶ 28 (emphasis added). Allowing plaintiffs here to seek damages against MasterCard and Visa for the continued existence of those network rules after January 1, 2004 would be contrary to the language of the releases and frustrate their purpose of settling all claims based on those network rules.

As the Second Circuit has noted: "It is not uncommon . . . for a release to prevent the releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged to have continued after the release's execution." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 126 (2d Cir. 2001). Indeed, in a case raising this precise issue, the court in *Madison Square Garden, L.P. v. National Hockey League*, No. 07-CV-8455, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) (Preska, J.), held that a release barred a subsequent antitrust challenge to the National Hockey League ("NHL")'s continued enforcement of League rules and policies that existed at the time the release was executed.

In that case, plaintiff Madison Square Garden ("MSG"), owner of the New York Rangers ("Rangers"), claimed that certain NHL policies relating to merchandising and licensing, broadcasting, and advertising and sponsorship rules violated the federal antitrust laws. *Id.* at *1-2. MSG previously had signed a consent agreement and release which provided that, as partial consideration for the NHL's consent to MSG's purchase of the Rangers, it released the NHL and its member teams from all liability arising out of any acts "occurring at any time up to and including the date of the execution of this Consent Agreement, relating to, or arising from, any hockey operations or any NHL activity . . . ." *Id.* at *5. MSG argued that the release did not apply to its antitrust claims since those claims were based on "current conduct, not historical conduct," and the release was "unenforceable as against public policy because it operate[d] as a prospective waiver of the right to sue for subsequent antitrust violations." *Id.* at *6.

Judge Preska rejected both arguments.  She found that MSG alleged only that the NHL had continued to enforce, or had reaffirmed, rules and policies that were in existence at the time of the execution of the release.  *Id.*  Accordingly, the release barred those claims "[b]ecause this very antitrust claim exist[ed] at the time of the release, and because the only allegations in the Complaint demonstrate that the League *continued* its enforcement of pre-existing policies."  *Id.* (internal quotations omitted).

Judge Preska also rejected the argument that the release violated public policy and was therefore unenforceable.  First, she emphasized that MSG did not challenge the legitimacy of the NHL itself as a joint venture, but only certain rules and policies of the venture that had existed at the time MSG executed the release.  *Id.* at *7 ("[h]ere, the venture's undisputed legitimacy diminishes the public policy concerns compared to those in the case of a Section 1 conspiracy whose very existence is unlawful").  Second, Judge Preska observed that the Second Circuit in *VKK* had supported "the enforceability . . . of releases of 'conspiracies alleged to continue post-release,'" and that "well-settled principles favor[] settlement as a matter of public policy."  *Id.* at *8 (quoting *VKK*, 244 F.3d at 126).  Finally, Judge Preska found "considerable support in the caselaw for the distinction . . . that the public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint," as opposed to "truly new and distinctive incidents  or subsequent conduct by the defendant that goes beyond what was released in the first instance."  *Id.* at 8-9 (citation omitted) (internal quotation omitted).

Other courts in the Second Circuit likewise have concluded that a settlement release extends to claims based on the future continuation of conduct in existence prior to a settlement that could have been alleged in, or that was within the factual predicate of, the settled action. *See*, *e.g.*, *Willsea v. Theis*, No. 98-Civ.-6773, 1999 WL 595629, at *12 (S.D.N.Y. Aug. 6, 1999)

(characterizing as "nonsense" the argument that a release did not bar the releasing party's post-settlement claims "equally available" in his settled action); *Hunter Douglas, Inc. v. Comfortex Corp.*, No. 98-CV-0479, 1999 U.S. Dist. LEXIS 10906, at *21 (N.D.N.Y. Mar. 11, 1999) (release barred a claim challenging ongoing practices that had "not been altered materially since the parties executed" a release); *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (release barred antitrust claim for "conduct extending past the date of the release," where "all of the harm alleged flows from and is related to the terms and conditions under which [the plaintiff] settled the original antitrust lawsuit").  Courts in other circuits have reached the same conclusion.[4]

Here, plaintiffs challenge MasterCard and Visa network rules that Judge Gleeson and Magistrate Judge Orenstein already have concluded were in existence by January 1, 2004 and part of the released factual predicate of the *Visa Check* case.  The releases thus bar plaintiffs' claims for any damages predicated on the continuation of those released network rules after January 1, 2004.  Nor does enforcement of the releases violate public policy.  To the contrary, not enforcing the releases would violate the public policy favoring settlement of disputes, since no antitrust case predicated on a defendant's practices could realistically be settled if the plaintiff could immediately challenge the defendant's continued adherence to the practice after the settlement.  To permit plaintiffs here to pursue their claims would improperly allow plaintiffs not only to retain the benefits of their *Visa Check* settlement—*i.e.*, billions of dollars and the modification of MasterCard and Visa card acceptance rules—but also to seek in subsequent

---

[4]  *See, e.g.*, *MCM Partners, Inc. v. Andrews-Bartlett & Assocs. Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (where the defendants' post-release refusal to deal with the plaintiff was based on "continued adherence" to a pre-release agreement, "the claim is clearly based on pre-[release] conduct and, as such, is expressly barred by the [r]elease"); *Shane v. Humana, Inc.*, No. 00-MD-1334, 2009 WL 7848518, at *4-9 (S.D. Fla. Nov. 5, 2009) (enjoining plaintiffs from prosecuting claims based on alleged antitrust conspiracy that originated before final approval of class settlement and that was related to released conduct), *adopted*, No. 00-Civ.-1334, 2009 WL 7848638 (S.D. Fla. Dec. 1, 2009).

litigation what they were unable to obtain at the negotiating table.  *See*, *e.g.*, *Crivera v. City of N.Y.*, No. 03-CV-447, 2004 WL 339650, at *4 (E.D.N.Y. Feb. 23, 2004) (Gleeson, J.) ("[o]nce an individual executes a valid settlement agreement, he cannot subsequently seek both the benefit of the agreement and the opportunity to pursue the claim he agreed to settle") (quoting *Reidy v. Rynyon*, 971 F. Supp. 760, 764 (E.D.N.Y. 1997).

Accordingly, plaintiffs' claims in this case also should be dismissed insofar as they seek damages incurred since January 1, 2004.[5]

## CONCLUSION

For the foregoing reasons, plaintiffs' complaint in this action should be dismissed in its entirety.

Dated:  August 13, 2013.

Respectfully submitted,

**WILLKIE FARR & GALLAGHER LLP**

By:  /s/ Keila D. Ravelo_____
      Keila D. Ravelo
      Wesley R. Powell
      Matthew Freimuth
      787 Seventh Avenue
      New York, NY  10019
      (212) 728-8000
      kravelo@willkie.com

---

[5]  Plaintiffs also are barred as members of the (b)(2) settlement class in *Payment Card* from asserting any claim for damages incurred after the settlement preliminary approval date based on the MasterCard and Visa network rules challenged in that case and in this case.  *See* Definitive Class Settlement Agreement at ¶ 68, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. Oct. 19, 2012) Dkt. No. 1656.  During the pendency of the Court's consideration of whether the settlement should be finally approved, the Court's preliminary approval order enjoins members of the Rule 23(b)(2) settlement class from asserting claims for such damages.  *See* Class Settlement Preliminary Approval Order at ¶ 29, *In re Payment Card*, No. 05-MD-1720 (E.D.N.Y. Nov. 27, 2012) Dkt. No. 1745.

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Kenneth A. Gallo
2001 K Street, NW
Washington, DC 20006

Andrew C. Finch
Gary R. Carney
1285 Avenue of the Americas
New York, NY 10019

*Attorneys for Defendants MasterCard Incorporated and MasterCard International Incorporated*

**HOLWELL SHUSTER & GOLDBERG LLP**

By: Michael S. Shuster /ZAK

Richard J. Holwell
Michael S. Shuster
Demian A. Ordway
Zachary A. Kerner
125 Broad Street, 39th Floor
New York, NY 10004
(646) 837-5151
mshuster@hsgllp.com

**ARNOLD & PORTER LLP**

Robert C. Mason
399 Park Avenue
New York, NY 10022
(212) 715-1000
robert.mason@aporter.com

Robert J. Vizas
Three Embarcadero Center, Tenth Floor
San Francisco, CA 94111

- 16 -

Mark R. Merley
Matthew A. Eisenstein
555 12th Street, NW
Washington, DC  20004

*Attorneys for Defendants Visa Inc., Visa U.S.A. Inc.,
and Visa International Service Association*[5]

---

[5]  Arnold & Porter LLP is counsel to Visa as to all plaintiffs in this action except J.C. Penney Corporation and The TJX Companies, Inc. and related entities.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

13 CV 3477

JUDGE ABRAMS

Target Corporation, Target Commercial Interiors, Inc.; TCC Cooking Co.; Macy's, Inc.; Macy's Retail Holdings, Inc.; Macy's West Stores Inc.; Macy's Florida Stores, LLC; Macy's Puerto Rico, Inc.; Macys.com, Inc.; Bloomingdales, Inc.; Bloomingdale's By Mail, Ltd.; Bloomingdale's The Outlet Store, Inc.; The TJX Companies, Inc.; Concord Buying Group Inc.; Marshalls of MA, Inc.; Marshalls of Matteson, IL., Inc.; Marshalls of Richfield, MN., Inc.; Marshalls of Calumet City, IL., Inc.; Marshalls of Beacon, VA., Inc.; Marmaxx Operating Corp.; HomeGoods, Inc.; Marshalls of Laredo, TX., Inc.; Marshalls of Chicago-Clark, IL., Inc.; Marshalls of CA, LLC; Marshalls of IL, LLC; T.J. Maxx of CA, LLC; T.J. Maxx of IL, LLC; Marshalls of Elizabeth, NJ, Inc.; Marshalls of Glen Burnie, MD., Inc.; Newton Buying Company of CA, Inc.; TJX Incentive Sales, Inc.; Derailed, LLC; New York Department Stores de Puerto Rico, Inc.; Sierra Trading Post, Inc.; Kohl's Corporation; Kohl's Department Stores, Inc.; Kohl's Value Services, Inc.; Kohl's Illinois, Inc.; Kohl's Michigan, L.P.; Kohl's Indiana L.P.; Staples, Inc.; Staples the Office Superstore East, Inc.; Staples the Office Superstore, LLC; Staples Contract & Commercial, Inc.; Quill Corporation; Quill Lincolnshire, Inc.; Medical Arts Press, Inc.; SmileMakers, Inc.; Thrive Networks, Inc.; SchoolKidz.com, LLC; J.C. Penney Corporation, Inc.; Office Depot, Inc.; Viking Office Products, Inc.; 4sure.com, Inc.; Computers4sure.com, Inc.; Solutions4sure.com, Inc.; L Brands, Inc. f/k/a Limited Brands, Inc.; Henri Bendel, Inc.; Victoria's Secret Stores, LLC; Victoria's Secret Stores Puerto Rico, LLC; Bath & Body Works LLC; Limited Brands Direct Fulfillment, Inc. d/b/a Victoria's Secret Direct; Bath & Body Works Direct, Inc.; OfficeMax Incorporated; OfficeMax North America, Inc.; BizMart, Inc.; BizMart (Texas), Inc.; Big Lots Stores, Inc.; C.S. Ross Company; Closeout Distribution, Inc.; PNS Stores, Inc.; Abercrombie & Fitch Co.; Abercrombie & Fitch Stores, Inc.;

Civil Action No.

ECF CASE


RECEIVED
MAY 23 2013
U.S.D.C. S.D.N.Y.
CASHIERS

J.M. Hollister, LLC; RUEHL No. 925, LLC; Gilly
Hicks, LLC; Ascena Retail Group, Inc.; The Dress
Barn, Inc.; Maurices Incorporated; Tween Brands,
Inc.; Tween Brands Direct, LLC; Charming Direct,
Inc.; Figi's, Inc.; Catherines of California, Inc.;
Catherines of Pennsylvania, Inc.; Catherines
Partners – Indiana, L.L.P.; Catherines Partners –
Washington, G.P.; Catherines Stores Corporation;
Catherines Woman Michigan, Inc.; Catherines,
Inc.; Charming Shoppes Outlet Stores, LLC; Lane
Bryant, Inc.; Catherines of Nevada, Inc.;
Catherines Partners-Texas, L.P., Catherines
Woman Delaware, Inc.; Outlet Division Store Co.
Inc.; Saks Incorporated; Saks & Company; Saks
Fifth Avenue Texas, LLC; Saks Fifth Avenue,
Inc.; SCCA Store Holdings, Inc.; Saks Direct,
LLC; Club Libby Lu, Inc.; The Bon-Ton Stores,
Inc.; The Bon-Ton Department Stores, Inc.;
McRIL, LLC; Carson Pirie Scott II, Inc.; Bon-Ton
Distribution, Inc.; The Bon-Ton Stores of
Lancaster, Inc.; Chico's FAS, Inc.; White
House|Black Market, Inc.; Soma Intimates, LLC;
Boston Proper, Inc.; Luxottica U.S. Holdings
Corp.; Luxottica USA LLC; Luxottica Retail
North America Inc.; Rays Houston; LensCrafters
International, Inc.; Air Sun; EYEXAM of
California, Inc.; Sunglass Hut Trading, LLC;
Pearle VisionCare, Inc.; The Optical Shop of
Aspen; MY-OP (NY) LLC; Lunettes, Inc.;
Lunettes California, Inc.; Oliver Peoples, Inc.;
Oakley, Inc.; Oakley Sales Corp.; Oakley Air; Eye
Safety Systems, Inc.; Cole Vision Services, Inc.;
EyeMed Vision Care LLC; Luxottica North
America Distribution LLC; American Signature,
Inc.; and The Door Store, LLC

                                    Plaintiffs,

          v.

Visa Inc., Visa U.S.A. Inc., Visa International
Service Association, MasterCard Incorporated, and
MasterCard International Incorporated

                                    Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs for their Complaint against Defendants Visa, Inc., Visa U.S.A., Inc., Visa International Service Association, MasterCard Incorporated, and MasterCard International Incorporated aver and allege as follows:

## INTRODUCTION

1.      This action is brought against Visa, Inc., Visa U.S.A., Inc., and Visa International Service Association (collectively "Visa") and MasterCard Incorporated and MasterCard International Incorporated (collectively "MasterCard").  Visa and MasterCard each has in the past and continues to manage, coordinate, and govern a combination in restraint of trade within the meaning of the Sherman Antitrust Act, 15 U.S.C. § 1.  Each combination has as its members the overwhelming majority of banks or financial institutions that issue credit and debit cards in the United States.  The vast majority of the banks and financial institutions that are members of Visa are also members of MasterCard, and issue both Visa-branded and MasterCard-branded credit and debit cards.  These issuing banks are independently owned and managed banks and financial institutions that compete to issue credit and debit cards to consumers.  However, through their membership and agreement to abide by the rules of Visa and MasterCard, each issuing bank has agreed not to compete for merchant acceptance of the credit and debit cards that it issues.

2.      There are two main categories of payment cards: credit (including charge) cards and debit cards.  Credit cards are payment cards that allow consumers to make purchases on credit.  Charge cards are similar to credit cards, but require that the full balance be paid upon receipt of the billing statement.  Debit cards are linked to a consumer's demand account or are prepaid.

3.     Banks earn income on credit (and charge) cards through fees and charges to the cardholder, including interest on the account balance, and from the fees and penalties that come with late payment on card balances.  Banks earn income on debit cards through the opportunity to use the funds a consumer maintains in his or her account and on various fees associated with those accounts.  Banks also earn income on credit and debit cards through the interchange fees paid by merchants.  Interchange fees are imposed on merchants by Visa and MasterCard for the privilege of accepting the issuing bank's card from a consumer as a means of payment, and are collected from the merchant and paid to the issuer of the card.  The profitability to issuing banks of credit and debit cards directly increases with the size and frequency of transactions in which the cards are used.

4.     Banks issuing credit and debit cards compete with one another to issue cards to consumers (sometimes referred to hereafter as "cardholders") who use those cards to purchase goods and services from merchants.  Issuing banks that are members of Visa and MasterCard compete with each other in the issuance of credit and debit cards to consumers.  For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash back rewards, points, and other features to compete for cardholders and to induce cardholders to use their cards.

5.     Visa and MasterCard have adopted nearly identical rules, which are agreed to by their member banks and imposed on merchants that accept cards issued by those banks.  These rules, or Competitive Restraints, eliminate competition among their member issuing banks for merchant acceptance of credit cards and merchant acceptance of debit cards.  As a consequence of having as members nearly all card issuers in the United States, and as a consequence of those card issuers having agreed to rules that preclude them from independently competing for

-4-

merchant acceptance, Visa and MasterCard and their members have obtained and maintained market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards in the United States.  The exercise of this market power has led merchants to pay excessive interchange fees.  In this manner, Visa and MasterCard have unlawfully restrained and continue to unlawfully restrain competition in these markets.

6.      The principal rules that constitute the Competitive Restraints are the setting of "default" interchange fees, the Honor All Cards Rules, the All Outlets Rules, the No Discount Rules, and the No Surcharge Rules.  These rules, individually and in combination, preclude merchants from gaining the benefits of competition as to the terms, including a fee (if any), for the acceptance of cards of particular issuing banks and preclude card issuers from competing for merchant acceptance of their cards.  As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at a supracompetitive level.  Plaintiffs have paid and continue to pay significantly higher costs to accept Visa-branded and MasterCard-branded credit and debit cards than they would if the banks issuing such cards competed for merchant acceptance.

7.      Because of their participation in the Competitive Restraints through their membership in Visa and MasterCard, issuing banks do not compete for transaction volume by independently competing for merchant acceptance.

8.      Visa and MasterCard, on behalf of their member issuing banks, have exploited their market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards by creating interchange fee schedules designed to increase the amount of interchange issuing banks are able to obtain from merchants.  While Visa and MasterCard nominally refer to these schedules as "default" interchange fee schedules, suggesting

it is possible for issuing banks and merchants to gain different interchange rates by entering acceptance agreements between themselves, the Competitive Restraints prevent such agreements. The Competitive Restraints also eliminate the features of Visa and MasterCard to compete for merchant acceptance through setting low "default" interchange fees. By setting and enforcing supracompetitive interchange fees applicable to all merchants that accept cards issued by their members, Visa and MasterCard act as agents of their members for the purposes of exercising the market power gained by their combinations.

9.      Over the past decade, judicial efforts to curb the exercise of market power by the Visa and MasterCard combinations have been ineffective. In 2003, the exclusivity rules of both combinations, which prohibited member banks from issuing cards competing on American Express or Discover networks, were declared unlawful. In that same year, in a class action settlement, Visa and MasterCard agreed to cease using the Honor All Cards Rules to tie credit card acceptance and debit card acceptance. Those actions did not diminish Visa's and MasterCard's power to dictate price and prevent competition. Immediately after those actions, both combinations increased the credit card interchange fees extracted from merchants. The debit card interchange fees they were imposing after these judicial actions were subsequently found by the Federal Reserve Board to be significantly above cost.

10.      In 2008, in response to a U.S. Department of Justice investigation, Visa withdrew its rule limiting merchants' ability to accept PIN debit cards. Two years later, in a settlement with the Department of Justice, the Visa and MasterCard combinations both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed. These changes did not diminish the combinations' market power or lead to a reduction in interchange fees paid by merchants. Instead, interchange fees continue to increase.

11.     In 2011, as mandated by the Durbin Amendment to the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. 1693o–2, the Federal Reserve Board set a maximum level of interchange fees that large banks could levy on debit card transactions and eliminated any distinction between signature debit (which carried interchange rates comparable to credit interchange rates) and PIN debit interchange.  This maximum fee was set significantly below the then-existing interchange fee levels set by Visa and MasterCard for debit card transactions.  The Federal Reserve Board action did not apply to the approximately one-third of debit cards issued by smaller, non-regulated banks, nor did it apply to credit cards.  The Federal Reserve Board did not prohibit debit or credit interchange fees from being set below this maximum level.

12.     If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks and merchants would operate in competitive markets for merchant acceptance of credit cards and merchant acceptance of debit cards and benefit from competition among issuing banks as to interchange fees.  Collectively set interchange fees do not protect merchants such as Plaintiffs, but rather allow issuing banks to charge interchange fees far in excess of the issuing banks' costs.  In competitive markets, interchange fees would move to competitive levels, and the interchange fees paid by Plaintiffs would be substantially below the amounts they have paid since January 1, 2004.  If merchants had the ability to use competitive strategies with respect to their acceptance of the cards of individual issuers, they would induce competition among issuing banks that would lead to lower interchange fees.

13.     Plaintiffs collectively paid more than $1 billion in their last fiscal year in credit and debit interchange fees to issuing banks that are members of Visa and MasterCard.  Interchange fees are generally one of a merchant's largest operating expense items.  Elimination

of the Competitive Restraints and restoration of competitive markets for merchant acceptance would substantially reduce interchange fees, allowing Plaintiffs to operate more efficiently and at lower costs, to the benefit of consumers. Plaintiffs operate in intensely competitive markets and would use the savings from a reduction in their interchange costs to increase their competitiveness by enhancing the value their customers receive.

## JURISDICTION AND VENUE

14.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Section 4 of the Clayton Act (15 U.S.C. § 15(a)).

15.     Venue is proper in the United States District Court for the Southern District of New York because Defendants reside in, are found in, have agents in, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

16.     This Court has personal jurisdiction over Defendants because, inter alia, they: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts with the United States, including in this District; and/or (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## DEFINITIONS

17.     For purposes of this Complaint, the following definitions apply.

18.     "Credit cards" are payment cards enabling the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards.  The credit cards at issue here are general purpose payment cards, as distinguished from private label cards, which can only be used at a single merchant.  Payment to a merchant for the goods or services purchased using a credit card is made by the issuing bank of the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the issuing bank and the cardholder.  Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer.  Credit card issuers compete for consumers by offering a variety of terms and types of cards, which vary by level of rewards that are intended to induce consumers to use their cards.  Cards with a higher level of rewards are often referred to as "premium" cards and carry higher interchange fees, though they afford no additional benefits to merchants.  Credit cards include charge cards, which allow the cardholder to obtain goods or services with a grace period before the cardholder is required to pay his or her full balance.

19.     "Debit cards" are payment cards that allow holders of accounts at a bank to pay for goods or services or to obtain cash by directly accessing their accounts.  They also include pre-paid cards, which require a prepayment of the amount that can be drawn by the user of the card.  There are two methods of authenticating debit cards.  PIN debit cards require the cardholder to enter a four-digit personal identification number (PIN) to authenticate the cardholder.  Signature debit cards usually require the cardholder's signature at the time of the transaction.  In the past, some PIN debit cards did not carry interchange fees or were subject to reverse interchange — where the merchant received a fee for card acceptance.  Signature debit cards generally carried higher interchange fees, some of which equaled the interchange fees charged for credit card transactions.  In 2011, pursuant to the Durbin Amendment, Federal

Reserve Board regulations set the maximum interchange fee for regulated issuers at $.21 plus 0.05% (plus an additional $.01 for fraud prevention for eligible issuers), or an average of $.23-.24 per debit transaction. In contrast, the signature debit interchange fees previously set by Visa and MasterCard average $.58 and $.59, respectively, for the same issuers.

20. An "issuing bank" is a member of Visa or MasterCard that issues general purpose credit or debit cards to cardholders. The majority of issuing banks are members of both Visa and MasterCard and compete with one another to issue cards to potential cardholders and to encourage the use of their cards by cardholders.

21. An "acquiring bank" is a member of Visa or MasterCard that acquires purchase transactions from merchants. All acquiring banks are members of Visa and MasterCard. As member banks, acquiring banks act as gatekeepers, ensuring that card transactions are routed over the Visa or MasterCard networks, that interchange fees set by Visa and MasterCard are paid on all transactions, and that merchants abide by the rules imposed by Visa and MasterCard. Acquiring banks compete with one another for the acquisition business of merchants.

22. "Network services" include, among other things, the services of authorization, clearance, and settlement of payment card transactions that the members of Visa and MasterCard have delegated to the networks to provide on the members' behalf. Authorization, clearance, and settlement refers to the process by which payment card transactions are completed.

23. "Interchange fee" is the fee that issuing banks receive and merchants pay when they accept a credit card or debit card issued by a member of the Visa or MasterCard combinations. Under the agreements by and among Visa and its member banks and MasterCard and its member banks, the so-called "default" interchange fees are set by Visa and MasterCard,

respectively, and the payment on interchange and other rules are enforced through the acquiring banks.

24.    "Merchant discount" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount, reflecting a merchant's incremental cost of acceptance.  The merchant discount includes the interchange fee.

## THE PARTIES

### PLAINTIFFS

25.    Plaintiffs Target Corporation, Target Commercial Interiors, Inc., TCC Cooking Co. (collectively "Target") are Minnesota corporations with their principal places of business in Minneapolis, Minnesota.  Target operates more than 1,700 retail stores throughout the United States and also engages in internet sales via Target.com.  Target had more than $71 billion in retail sales in 2012.  Target accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Target has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Target, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

26.    Plaintiff Macy's, Inc. is a Delaware corporation with its principal places of business in Cincinnati, Ohio and New York, New York.  Macy's, Inc. is an omnichannel retailer, with fiscal 2012 sales of $27.7 billion.  Macy's, Inc. through its subsidiaries, plaintiffs, Macy's Retail Holdings, Inc., Macy's West Stores Inc., Macy's Florida Stores, LLC, Macy's Puerto Rico, Inc., Macys.com, Inc., Bloomingdale's, Inc., Bloomingdale's By Mail, Ltd., and Bloomingdale's The Outlet Store, Inc. (collectively "Macy's"), operates the Macy's and Bloomingdale's brands with nearly 840 stores in 45 states, the District of Columbia, Guam, and

Puerto Rico under the names of Macy's and Bloomingdale's; the Macys.com and Bloomingdales.com websites, and 12 Bloomingdale's Outlet stores. Macy's accepts credit cards and debit cards for payment in its stores and online, including both Visa and MasterCard debit and credit cards. Accordingly, Macy's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Macy's, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

27.     Plaintiff The TJX Companies, Inc. is a Delaware corporation with its principal place of business in Framingham, Massachusetts. The TJX Companies, Inc. is a global off-price apparel and home fashions retailer with approximately $19.7 billion in net sales in the United States in the fiscal year ending February 2, 2013. The TJX Companies, Inc., on its own behalf and through its subsidiaries, plaintiffs Concord Buying Group Inc.; Marshalls of MA, Inc.; Marshalls of Matteson, IL., Inc.; Marshalls of Richfield, MN., Inc.; Marshalls of Calumet City, IL., Inc.; Marshalls of Beacon, VA., Inc.; Marmaxx Operating Corp.; HomeGoods, Inc.; Marshalls of Laredo, TX., Inc.; Marshalls of Chicago-Clark, IL., Inc.; Marshalls of CA, LLC; Marshalls of IL, LLC; T.J. Maxx of CA, LLC; T.J. Maxx of IL, LLC; Marshalls of Elizabeth, NJ, Inc.; Marshalls of Glen Burnie, MD., Inc.; Newton Buying Company of CA, Inc.; TJX Incentive Sales, Inc.; Derailed, LLC; New York Department Stores de Puerto Rico, Inc.; and Sierra Trading Post, Inc. (collectively "TJX"), operates more than 2,000 Marshalls, T.J. Maxx, HomeGoods, and Sierra Trading Post stores in the United States. TJX accepts both Visa and MasterCard debit and credit cards for payment in its stores, and for online and catalog sales currently made primarily through Sierra Trading Post. Accordingly, TJX has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive

Restraints.  TJX, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

28.     Plaintiff Kohl's Corporation is a Wisconsin corporation with its principal place of business in Menomonee Falls, Wisconsin.  Kohl's Corporation, through its subsidiaries, plaintiffs, Kohl's Department Stores, Inc., Kohl's Value Services, Inc., Kohl's Illinois, Inc., Kohl's Michigan, L.P., and Kohl's Indiana L.P. (collectively "Kohl's"), operates more than 1,100 Kohl's stores in 49 states.  It also engages in internet sales.  In fiscal year 2012, Kohl's had sales of more than $19 billion.  Kohl's accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Kohl's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Kohl's, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

29.     Plaintiff Staples, Inc. ("Staples") is a Delaware corporation with its principal place of business in Framingham, Massachusetts.  Staples, Inc., through and with its subsidiaries, plaintiffs Staples the Office Superstore East, Inc., Staples the Office Superstore, LLC, Staples Contract & Commercial, Inc., Quill Corporation, Quill Lincolnshire, Inc., Medical Arts Press, Inc., SmileMakers, Inc., Thrive Networks, Inc., and SchoolKidz.com, LLC (collectively "Staples"), operates more than 1,500 stores in the United States and also is engaged in e-commerce and delivery sales.  Staples had net sales of more than $16 billion in the 2012 fiscal year.  Staples accepts both Visa and MasterCard debit and credit cards for payment in its retail, online, and delivery channels.  Accordingly, Staples has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Staples,

-13-

therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

30.     Plaintiff J. C. Penney Corporation, Inc. ("JCPenney") is a Delaware corporation with its principal place of business in Plano, Texas.  JCPenney operates approximately 1,100 stores in the United States and Puerto Rico, engages in e-commerce, and during part of the relevant time period, also engaged in a significant catalog business.  JCPenney accepts both Visa and MasterCard credit and debit cards for payment in its stores and online.  Accordingly, JCPenney has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  JCPenney, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

31.     Plaintiffs Office Depot, Inc., Viking Office Products, Inc., 4sure.com, Inc., Computers4sure.com, Inc., and Solutions4sure.com, Inc. (collectively "Office Depot") are Delaware corporations with their principal place of business in Boca Raton, Florida.  Office Depot is a supplier of office supplies and services with $10.7 billion in sales in fiscal 2012.  At the end of 2012, Office Depot operated approximately 1,100 retail stores and also engaged in internet sales.  Office Depot accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Office Depot has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Office Depot, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

32.     Plaintiff L Brands, Inc. (f/k/a Limited Brands, Inc.) is a Delaware corporation with its principal place of business in Columbus, Ohio.  L Brands, formerly known as Limited Brands, Inc., through its subsidiaries, plaintiffs, Henri Bendel, Inc., Victoria's Secret Stores,

-14-

LLC, Victoria's Secret Stores Puerto Rico, LLC, Bath & Body Works LLC, Limited Brands Direct Fulfillment, Inc. d/b/a Victoria's Secret Direct ("VSD"), and Bath & Body Works Direct, Inc. ("BBWD") (collectively "L Brands"), operates approximately 2,800 specialty retail stores in the United States. L Brands, through VSD, engages in internet and catalog sales within the United States. L Brands, through BBWD, engages in internet sales within the United States. During the fiscal year ended in February 2013, L Brands had more than $10 billion in net sales. L Brands accepts both Visa and MasterCard debit and credit cards for payment in its stores and online. Accordingly, L Brands has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. L Brands, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

33. Plaintiffs OfficeMax Incorporated, OfficeMax North America, Inc., BizMart, Inc., and BizMart (Texas), Inc. (collectively "OfficeMax") are Delaware corporations with their principal places of business in Naperville, Illinois. OfficeMax provides products, solutions, and services for the workplace, whether for business or at home. OfficeMax customers are served through e-commerce, more than 800 stores in the United States, and direct sales and catalogs. In fiscal 2012, OfficeMax had net sales of approximately $6.9 billion. OfficeMax accepts, inter alia, both Visa and MasterCard credit and debit cards for payment. Accordingly, OfficeMax has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. OfficeMax, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

34. Plaintiffs Big Lots Stores, Inc., C.S. Ross Company, Closeout Distribution, Inc., and PNS Stores, Inc. (collectively "Big Lots") are incorporated in Ohio, Ohio, Pennsylvania, and California, respectively, with their principal places of business in Columbus, Ohio. Big Lots

operates approximately 1,500 stores in 48 states. In fiscal 2012, Big Lots had net sales of $5.4 billion. Big Lots accepts both Visa and MasterCard debit and credit cards for payment in its stores. Accordingly, Big Lots has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Big Lots, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

35.     Plaintiff Abercrombie & Fitch Co. is a Delaware corporation with its principal place of business in New Albany, Ohio. Abercrombie & Fitch Co., through its subsidiaries, plaintiffs, Abercrombie & Fitch Stores, Inc., J.M. Hollister, LLC, RUEHL No. 925, LLC, and Gilly Hicks, LLC (collectively "Abercrombie"), sells and has sold clothing and accessories at approximately 900 retail stores in the United States and also engages in internet sales. Abercrombie & Fitch had net sales of approximately $4.5 billion in fiscal 2012. Abercrombie & Fitch accepts both Visa and MasterCard debit and credit cards for payment in its stores and online. Accordingly, Abercrombie & Fitch has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Abercrombie & Fitch, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

36.     Plaintiff Ascena Retail Group, Inc. is a Delaware corporation with its principal place of business in Suffern, New York. Ascena Retail Group, Inc. is a specialty retailer that offers clothing, shoes, and accessories for missy and plus-size women through its Lane Bryant, Cacique, maurices, dressbarn, and Catherine subsidiary brands; and for tween girls and boys through its subsidiary brands Tween Brands, Inc. d/b/a Justice and Brothers, respectively (collectively "Ascena"). Ascena operates approximately 3,800 stores through its subsidiaries The Dress Barn, Inc.; Maurices Incorporated; Tween Brands, Inc.; Tween Brands Direct, LLC;

Charming Direct, Inc.; Figi's, Inc.; Catherines of California, Inc.; Catherines of Pennsylvania, Inc.; Catherines Partners – Indiana, L.L.P.; Catherines Partners – Washington, G.P.; Catherines Stores Corporation; Catherines Woman Michigan, Inc.; Catherines, Inc.; Charming Shoppes Outlet Stores, LLC; Lane Bryant, Inc. on behalf of itself and its assignors (these assignors are identified in the attached Exhibit A); Catherines of Nevada, Inc.; Catherines of Pennsylvania, Inc.; Catherines Partners-Texas, L.P.; Catherines Woman Delaware, Inc.; Outlet Division Store Co. Inc., throughout the United States and Puerto Rico. Ascena also engages through its subsidiaries in e-commerce. In fiscal year 2012, Ascena had net retail sales of over $3.3 billion. Ascena through its subsidiaries accepts both Visa and MasterCard debit and credit cards for payment in its stores and online. Accordingly, Ascena through its subsidiaries has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Ascena, through its subsidiaries, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

37. Plaintiff Saks Incorporated is a Tennessee corporation with its principal place of business in New York, New York. Saks Incorporated, through its subsidiaries Saks & Company; Saks Fifth Avenue Texas, LLC; Saks Fifth Avenue, Inc.; SCCA Store Holdings, Inc.; Saks Direct, LLC; and Club Libby Lu, Inc. (collectively "Saks"), operates 42 Saks Fifth Avenue and 66 Saks Fifth Avenue OFF 5th retail stores in the United States and also engages in internet sales. In fiscal year ended February 2, 2013, Saks had net sales of $3.148 billion. Saks accepts both Visa and MasterCard debit and credit cards for payment in its stores and online. Accordingly, Saks has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints. Saks, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

38.     Plaintiff The Bon-Ton Stores, Inc. is a Pennsylvania corporation with its principal place of business in York, Pennsylvania.  The Bon-Ton Stores, Inc., through its subsidiaries, plaintiffs, The Bon-Ton Department Stores, Inc., McRIL, LLC, Carson Pirie Scott II, Inc., Bon-Ton Distribution, Inc., and The Bon-Ton Stores of Lancaster, Inc. (collectively "Bon-Ton") operates 272 Bon-Ton, Bergner's, Boston Store, Carson's, Elder-Beerman, Herberger's, Carson Pirie Scott, and Younkers stores in the United States and also engages in internet sales.  Bon-Ton had net sales of approximately $2.9 billion in fiscal 2012.  Bon-Ton accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Bon-Ton has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Bon-Ton, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

39.     Plaintiff Chico's FAS, Inc. is a Florida corporation with its principal place of business in Fort Myers, Florida.  Chico's FAS, Inc. is a specialty retailer of women's apparel. Chico's FAS, Inc., on its own behalf and through its subsidiaries, plaintiffs, White House|Black Market, Inc., Soma Intimates, LLC, and Boston Proper, Inc. (collectively "Chico's"), operates more than 1,397 stores in 48 states, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico.  It also engages in internet and catalog sales.  Chico's had net sales of more than $2.5 billion in fiscal year 2012.  Chico's accepts both Visa and MasterCard debit and credit cards for payment in its stores and online.  Accordingly, Chico's has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Chico's, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

40.     Plaintiff Luxottica U.S. Holdings Corp. is a Delaware corporation with its principal place of business in Port Washington, New York.  Luxottica U.S. Holdings Corp. and its direct and indirect subsidiaries and affiliates Luxottica USA LLC; Luxottica Retail North America Inc.; Rays Houston; LensCrafters International, Inc.; Air Sun; EYEXAM of California, Inc.; Sunglass Hut Trading, LLC; Pearle VisionCare, Inc.; The Optical Shop of Aspen; MY-OP (NY) LLC; Lunettes, Inc.; Lunettes California, Inc., Oliver Peoples, Inc.; Oakley, Inc.; Oakley Sales Corp.; Oakley Air; Eye Safety Systems, Inc.; Cole Vision Services, Inc.; EyeMed Vision Care LLC; and Luxottica North America Distribution LLC (collectively "Luxottica") are wholesalers and retailers of iconic sun and prescription eyewear, among other activities, and operate more than 4,000 retail stores in the United States, including LensCrafters, Pearle Vision, Sunglass Hut, and Oakley.  Luxottica's net sales in fiscal 2012 are not reported.  Luxottica accepts both Visa and MasterCard debit and credit cards for payment.  Accordingly, Luxottica has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants' Competitive Restraints.  Luxottica, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

41.     Plaintiff American Signature, Inc. and its subsidiary The Door Store, LLC (collectively "American Signature") are privately held companies with their principal place of business in Columbus, Ohio.  American Signature operates approximately 130 American Signature Furniture, and Value City Furniture stores in the United States.  The Door Store, LLC ceased operating stores in 2011.  American Signature is privately held and does not report its income.  American Signature accepts both Visa and MasterCard debit and credit cards for payment in its stores and, just recently, online.  Accordingly, American Signature has been forced to pay Defendants' supracompetitive interchange fees and to abide by Defendants'

Competitive Restraints. American Signature, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.

42. The Plaintiffs have timely opted out of the Rule 23(b)(3) settlement class preliminarily approved by the court on November 28, 2012 in the case captioned: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720-JG-JO, United States District Court for the Eastern District of New York. If Plaintiffs were allowed, they would also opt out of the Rule 23(b)(2) settlement class in that litigation.

## **DEFENDANTS**

43. Until the corporate restructuring and initial public offering described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California. Defendant Visa U.S.A., Inc. was a group-member of Visa International Service Association and was also a non-stock Delaware corporation. Visa U.S.A., Inc. had its principal place of business in San Francisco, California. Visa U.S.A., Inc.'s members were the financial institutions acting as issuing banks and acquiring banks in the Visa system.

44. Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California. Defendant Visa Inc. was created through a corporate reorganization in or around October 2007. Visa U.S.A. Inc.'s member banks were the initial shareholders of Visa, Inc.

45. Defendants Visa Inc., Visa U.S.A., Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

46. Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May 2001. Its principal place of business is in Purchase, New York.

47.     Defendant MasterCard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing banks and acquiring banks.  Prior to the initial public offering described below, MasterCard International Incorporated was the principal operating subsidiary of MasterCard Incorporated.

48.     Defendants MasterCard International Incorporated and MasterCard Incorporated are referred to collectively as "MasterCard" in this Complaint.

## ALLEGATIONS

## THE PAYMENT CARD INDUSTRY IN GENERAL

49.     The payment card industry involves two categories of general purpose payment cards:  (1) credit (including charge) cards and (2) debit cards.  As explained more fully below, credit cards constitute a separate product market from debit cards.

50.     Card issuers earn income when card users select and use their cards and when merchants accept their cards.  Issuing banks compete to have cardholders carry and use payment cards that they issue.  By agreeing to the Competitive Restraints, issuing banks have agreed not to compete among themselves for merchant acceptance of payment cards.

51.     Credit cards (other than charge cards) permit consumers to borrow the money for a purchase from the card issuer and to repay that debt over time, according to the provisions of a revolving-credit agreement between the cardholder and the issuing bank.  Charge cards provide an interest-free loan during a grace period.

52.     Issuing banks compete for cardholders and card usage by offering numerous credit card products, some of which offer features such as cash back rebates, low interest rates, low or no annual fees, and rewards programs tied to usage.  Cards that offer cash-back, airline miles or other usage benefits are often referred to as "rewards cards."  Those rewards cards that

-21-

offer the highest levels of rewards are referred to as "premium cards" and include cards such as Visa Signature Preferred and MasterCard World Elite.  Standard or "traditional" credit cards, which do not offer the same array of features to cardholders, include products such as Visa Traditional and the MasterCard Core Value card.  Interchange fees for premium credit cards are higher than the interchange fees merchants are charged on other rewards cards, which in turn are higher than those charged on standard credit card transactions.  Merchants such as Plaintiffs receive no additional benefits from the higher interchange fees they must pay on transactions in which those cards are used.  Nevertheless, merchants do not have the ability to refuse to accept rewards cards.

53.     Debit cards are one means for demand deposit account holders to access the money in their accounts.  Pre-paid debit cards allow cardholders to access the funds deposited on the card when it was purchased.  There are two primary forms of authentication in use for debit cards in the United States.  One is signature-based, in which the cardholder's signature is usually (but not always) obtained at the time of the transaction.  The other is PIN-based, in which the cardholder enters a four-digit PIN to authenticate the cardholder.

54.     Because debit card transactions promptly withdraw funds from the cardholder's account or from the card balance, rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers.  These differences underlay the court's determination in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), that credit card transactions comprised a separate market from the market for debit card transactions.

## THE COMBINATIONS

55.     Visa and MasterCard until recently were organized as joint ventures of their member issuing banks and acquiring banks.  As members of the joint ventures, the member banks agreed to a collection of restrictive rules, referred to herein as the Competitive Restraints, and to impose those Competitive Restraints on merchants that accept Visa-branded and MasterCard-branded cards.  Among the Competitive Restraints are "default" interchange fees that merchants are required to pay for the privilege of accepting Visa-branded and MasterCard-branded cards.  "Default" interchange fee rates are set by Visa and MasterCard for the benefit of their member issuing banks.  As a result of the Competitive Restraints, the "default" interchange fees are made binding.

56.     Through these joint ventures, Visa, MasterCard, and their respective issuing banks collectively have gained market power in the payment card market.  The Competitive Restraints have eliminated competition among issuing banks for merchant acceptance and eliminated any possibility that competition between the issuing banks could enable separate terms of acceptance for the cards of each issuing bank.  These Competitive Restraints have eliminated the development of competitive markets for merchant acceptance.

57.     The Competitive Restraints enforced by Visa and MasterCard, and the actions taken in furtherance of these restraints, constituted and continue to constitute combinations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

58.     In 2006 and 2008, respectively, MasterCard and Visa each changed their ownership structures through initial public offerings ("IPOs") wherein the member banks partially divested their ownership of Visa and MasterCard.  But the IPOs did not change the essential character of their combinations or the Competitive Restraints.  The motivation for these

IPOs was to limit the appearance that Visa and MasterCard were controlled by their member banks. According to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard. In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers — or member financial institutions — own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

59. After the IPOs, neither Visa, MasterCard, nor any of the member banks took any affirmative action to withdraw from the respective combinations. To the contrary, even after the IPOs, the member banks of Visa and MasterCard continued to agree to and to enforce and adhere to the Competitive Restraints that eliminate competition among issuing banks for merchant acceptance. Visa and MasterCard have continued to set "default" interchange fees for the benefit of their issuing bank members. Thus, even after the IPOs, Visa's and MasterCard's members maintained and enforced the Competitive Restraints ensuring that they would not compete for merchant acceptance.

60. After the IPOs, as before, Visa and MasterCard serve as facilitators and coordinators of horizontal agreements among their member banks to continue to adhere to and enforce "default" interchange fees and the Competitive Restraints. It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks also to impose and adhere to those restraints. Visa and MasterCard, by acting as the managers of their respective combinations and coordinating agreements to continue imposing and adhering to the Competitive Restraints,

eliminate competition for merchant acceptance among their respective issuing banks. But for the arrangements facilitated by Visa and MasterCard, the member banks would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

61.    Each issuing bank is an independently owned and independently managed business. Each issuing bank is a separate economic actor pursuing separate economic interests. In other aspects of their businesses, the member banks compete against one another. For example, the banks compete with one another for cardholders by creating payment card products that offer an array of interest rates, annual fees, purchase rewards, and other features that will make their payment cards more attractive than those offered by other issuing banks. As found in *United States v. Visa U.S.A., Inc.*, cardholders "can choose from thousands of different card products with varying terms and features, including a wide variety of rewards and co-branding programs and services such as automobile insurance, travel and reservation services, emergency medical services and purchase security/extended protection programs." 163 F. Supp. 2d at 334. These facts continue to be true today.

62.    However, the member banks do not compete for merchant acceptance of the cards they issue. Instead, both before and after the Visa and MasterCard IPOs, the member banks have ceded to Visa and MasterCard decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue. By continuing to agree to and adhere to the Competitive Restraints and default interchange fees, the member banks have deprived the marketplace of independent centers of decision-making and, therefore, of actual or potential competition.

## THE RELEVANT PRODUCT MARKETS

63.     The relevant product markets are the market for merchant acceptance of general purpose credit (including charge) cards and the market for merchant acceptance of debit cards. Credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender.

64.     Banks issuing credit and debit cards compete with one another to issue their cards to consumers (cardholders) who use those cards to purchase goods and services from merchants. This competition occurs in the markets for the issuance of credit and debit cards. Absent the Competitive Restraints, banks issuing such cards would seek access to merchants that are willing to accept their cards as payment for the goods and services the merchants sell to consumers. As a result, absent the Competitive Restraints at issue in this case, issuing banks would compete over the terms of acceptance of their cards by merchants.

65.     Merchant acceptance of general purpose credit cards is a relevant product market. A credit card is not interchangeable with a debit card or other form of tender. Many cardholders desire the ability to access a line of credit, defer payment, or other features offered by the credit cards. For this reason, Plaintiffs and other merchants cannot discontinue acceptance of credit cards, even in the face of high or increasing interchange fees, without losing sales. Visa and MasterCard and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

66.     Merchant acceptance of debit cards is also a relevant product market. Debit cards are not reasonably interchangeable with credit cards and other forms of tender. Debit cards differ from credit cards in significant ways. Debit cards must be tied to a bank account, or pre-

paid, unlike credit cards. When a debit card is used, the funds are withdrawn from the cardholder's account either the same day or within a few days. Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks on their person, and not all merchants accept checks. Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options. Thus, merchants cannot discontinue acceptance of debit cards.

67. Debit cards are also regulated separately and differently from credit cards. In 2011, pursuant to the Durbin Amendment, the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks. The legislation did not mandate that Federal Reserve Board regulate interchange fees charged in connection with credit card transactions.

68. Visa, MasterCard, and their debit card issuing members are not constrained in the charges they impose on merchants for debit card acceptance by the availability of credit cards or other forms of tender as a payment option.

## RELEVANT GEOGRAPHIC MARKET

69. The relevant geographic market is the United States and its territories.

70. The default interchange fees are set by Visa and MasterCard, respectively, on a national basis. Similarly, the Competitive Restraints are specific to the United States and its territories.

71. Plaintiffs, along with many other merchants, operate throughout the United States. The Competitive Restraints imposed on them require that they accept all cards of all issuing banks who are members of Visa or of MasterCard at "default" interchange fees at all of their outlets throughout the United States.

72. Visa and MasterCard, and their largest issuing banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole.

## THE COMPETITIVE RESTRAINTS

73. On behalf of the issuing banks that are their members, Visa and MasterCard each have adopted and imposed supracompetitive "default" interchange fees and other Competitive Restraints on Plaintiffs that eliminate competition. These Competitive Restraints prevent competition among the issuing banks for transaction volume from merchants. As a result, the Competitive Restraints cause Plaintiffs' costs of acceptance to be higher than would prevail in a competitive market.

74. Collective Setting of Interchange: Visa and MasterCard set so-called "default" interchange fees on credit card and debit card transactions that merchants are required to pay to their issuing banks. The setting of "default" interchange fees and other Competitive Restraints constitute the fixing of prices within the meaning of the Sherman Act.

75. Visa and MasterCard each have established complex "default" interchange fee schedules. In setting the interchange fees that are paid to their member banks, Visa and MasterCard each acts as the manager of its respective combination, setting the price that merchants pay for card acceptance. Interchange fees account for the largest portion of merchant costs for accepting such cards.

76. Interchange fees are not set to recover Visa's or MasterCard's costs of providing network services. Interchange is a fee that Visa and MasterCard, respectively, acting in combination with the issuing banks, require merchants to pay to the issuing banks.

77. Visa purports to set non-binding "default" interchange fees. Visa Core Principle No. 10.3 provides that "[i]nterchange reimbursement fees are determined by Visa . . . or may be

customized where members have set their own financial terms for the interchange of a Visa transaction or Visa has entered into business agreements to promote acceptance and card usage."

78. MasterCard also purports to set non-binding "default" interchange fees. MasterCard Rule 9.4 provides: "[a] transaction or cash disbursement cleared and settled between Customers gives rise to the payment of the appropriate interchange fee or service fee, as applicable. The Corporation has the right to establish default interchange fees and default service fees (hereafter referred to as 'interchange fees' and 'service fees,' or collectively, 'fees'), it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two Customers in place. . . . Unless an applicable bilateral interchange fee or service fee agreement between two Customers is in place, any intraregional or interregional fees established by the Corporation are binding on all Customers."

79. Acquiring banks that do not deduct the applicable interchange fee when submitting a transaction for authorization, clearance, and settlement are subject to fines assessed by Visa and MasterCard. Both Visa's and MasterCard's rules, quoted above, fix interchange, because the other Competitive Restraints remove any independent competition among issuing banks in the setting of interchange fees.

80. Absent the Competitive Restraints, Plaintiffs would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks for merchant acceptance. In the cartelized markets created by the Visa and MasterCard combinations, Visa and MasterCard, acting for their member banks, establish interchange fee schedules for their member banks. Plaintiffs are among the merchants injured by this collective setting of interchange fees by Visa and MasterCard.

81. Honor All Cards Rules: These rules require in relevant part that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, no matter which bank issued the card or the card type. Similarly, a merchant that accepts Visa-branded or MasterCard-branded debit cards, must accept all Visa-branded or MasterCard-branded debit cards, no matter the issuing bank. Because of the Honor All Cards Rules, Plaintiffs cannot reject any or all of the types of cards issued by any particular issuing bank. Thus, Plaintiffs are precluded from gaining the benefits of competition as to the terms upon which they will accept or reject the cards of any issuing bank that is a member of Visa or MasterCard. As a result, the "default" interchange fees become binding on Plaintiffs.

82. All Outlets Rules: The All Outlets Rules require merchants who accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations. A merchant is not permitted to accept the cards at some stores but not others. These rules preclude merchants from gaining the benefits of competition as to the terms of acceptance by location (for example, by region of the country).

83. Prior to January 27, 2013, the All Outlets Rules required merchants that operated under multiple banners (e.g., trade names or name plates) and that accepted Visa-branded or MasterCard-branded payment cards to accept those cards at all of their banners. This rule precluded merchants from gaining the benefits of competition as to the terms of acceptance with issuing banks by banner or by locations within a banner. As a result, Plaintiffs could not indicate they would terminate acceptance of the cards of a particular issuing bank at some of their banners in order to promote competition as to fees.

84.     Changes that Visa and MasterCard made to their All Outlets Rules implemented after January 27, 2013, do not diminish the anticompetitive effects or the injuries Plaintiffs continue to suffer.  The All Outlets Rules still require that if a merchant elects to accept Visa-branded or MasterCard-branded cards at one of its banners, it must accept all such cards at all locations of that banner, and it must accept all such cards no matter the card issuer.  Merchants also cannot accept the cards of some issuers but not others at a particular location.

85.     No Discount Rules:  Under the No Discount Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a payment card.  However, pursuant to a settlement with the United States Department of Justice, as of July 20, 2011, Visa and MasterCard changed their rules to allow merchants to offer discounts to consumers in some limited circumstances.  These changes to the No Discount Rules have not significantly diminished the anticompetitive effects of the Competitive Restraints.  While Visa and MasterCard now allow merchants more discounting options, merchants still are prohibited from offering discounts to consumers for using the cards issued by particular issuing banks.  A merchant's ability to utilize issuer-specific discounts would be an important tool for gaining the benefits of competition as to the terms of acceptance with an issuing bank.

86.     No Surcharge Rules:  The No Surcharge Rules prohibit Plaintiffs from surcharging transactions in which a consumer used a Visa-branded card or a MasterCard-branded card.  These rules eliminate a merchant's ability to utilize surcharging as a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank.  Absent the rules, a merchant could surcharge a transaction in which the consumer uses the card of a particular issuing bank, such as one that demanded a high interchange fee.  As of January 27, 2013, Visa and MasterCard altered their No Surcharge Rules to permit merchants to surcharge credit card

customers under limited circumstances. Debit card transactions still may not be surcharged under the rule modification. Changes to the No Surcharge Rules for credit cards implemented after January 27, 2013 do not eliminate their anticompetitive effects or the injuries Plaintiffs continue to suffer. Even as modified, the No Surcharge Rules prohibit a merchant from surcharging based on the identity of the card issuer.

87.    The Competitive Restraints, individually and in combination, eliminate issuing bank competition for merchant acceptance. In the absence of these rules, the market for merchant acceptance would be competitive. Plaintiffs and the issuing banks would be able to gain the benefits of competition as to the terms under which Plaintiffs would accept an issuing bank's cards, including the amount of interchange fees — if any — Plaintiffs would pay on transactions involving an issuing bank's cards. Competition among issuing banks for merchant acceptance would result in lower interchange fees for Plaintiffs and allow them to enhance the value their customers receive.

88.    The Honor All Cards Rules, the No Discount Rules, the No Surcharges Rules, and the All Outlets Rules, individually and in combination, eliminate the incentives for Visa and MasterCard to compete for merchant acceptance through setting lower "default" interchange fees.

89.    In addition to the Competitive Restraints, a variety of other rules and regulations (often not publicly disclosed) enforced by Visa and MasterCard and their member banks also operate to support the anticompetitive effects of the Competitive Restraints and imposition of "default" interchange fees on Plaintiffs.

90.    The Competitive Restraints, including the collective setting of "default" interchange fees, are not reasonably necessary to accomplish any legitimate efficiency-

generating objectives of the Visa and MasterCard combinations. Furthermore, there exist numerous alternative means that are less harmful to competition by which any such objectives could be accomplished.

## **MARKET POWER**

91.     Visa and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States and its territories.

92.     In 2001, in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court found that Visa had market power in the market for credit card network services with a 47% share of the dollar volume of credit card transactions in the United States. In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court reaffirmed that Visa had market power in the credit card market based on a finding that its market share fluctuated between 43% and 47%, as well as the barriers to entering the relevant product market. Visa's share of the credit card market has not changed significantly since these two holdings. The prior judicial findings of market power demonstrate that Visa has market power in the general purpose credit card market.

93.     There are significant barriers to entry into the market for general purpose credit cards. Indeed, the court in *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), specifically found that there are high barriers to entry into the general purpose credit card market. Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion. Both AT&T and Citibank conducted entry analyses, but decided it would be unprofitable to attempt to start a competing general purpose credit card business.

94.     The difficulties associated with entering the network market are exemplified by the fact that no company has entered since Discover did so in 1985.  Discover has never achieved more than a 7% share of the general purpose credit card market and its current share is approximately 5%.

95.     Visa's conduct is direct evidence of its market power and that of its issuing banks. Interchange fees are set by Visa on behalf of its issuing banks.  Visa promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, Visa's credit card issuing banks would gain the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

96.     Visa's "default" credit interchange fees demonstrate Visa's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen. Despite these increases, merchants have not stopped accepting Visa credit cards.  Further, Visa's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

97.     Visa's market power in credit cards is also demonstrated by the fact that when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few if any merchants chose to stop accepting Visa credit cards, and Visa did not reduce its credit card interchange fees.  In 2012, the first full year after implementation of reduced interchange fees on debit transactions, Visa credit card transactions and purchase volume increased.

98.     Competition with MasterCard does not eliminate Visa's exercise of market power in the market for merchant acceptance of general purpose credit cards.  During the period that Visa and MasterCard were both joint ventures consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance.  After their respective IPOs, Visa's and MasterCard's membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

99.     MasterCard and its issuing banks jointly have market power in the relevant market for merchant acceptance of general purpose credit cards in the United States.

100.     In *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court held that MasterCard's 26% share of dollar volume of credit and charge card transactions was sufficient to demonstrate that it had market power in the market for credit card network services.  In *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003), the court held that MasterCard's 26% to 28% share of the credit card market was sufficiently high to go to a jury on the question of MasterCard's market power.  MasterCard's share of the credit card market has not changed significantly since those decisions.

101.     MasterCard's conduct is direct evidence of its market power and that of its issuing banks.  Interchange fees are set by MasterCard on behalf of its issuing banks.  MasterCard also promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, MasterCard's credit card issuing banks would gain the benefits of competition as to the terms of merchant

acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

102. MasterCard's "default" credit interchange fees demonstrate MasterCard's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen. Despite these increases, merchants have not stopped accepting MasterCard credit cards. Further, MasterCard's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

103. Competition with Visa does not eliminate MasterCard's exercise of market power in the market for merchant acceptance of general purpose credit cards either. During the period that Visa and MasterCard were joint ventures consisting of their member banks, they adopted rules that limited competition for merchant acceptance. After their respective IPOs, Visa's and MasterCard's membership, rules, and most importantly power to obtain high interchange fees from merchants did not change and continue to constrain competition between Visa and MasterCard and among the members of both combinations.

104. As alleged above, there are significant barriers to entry into the market for the provision of general purpose payment card network services to merchants.

105. The debit card market is dominated by Visa and MasterCard. Combined, Visa and MasterCard comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today. Only Visa, MasterCard, and Discover allow signature authorization of debit transactions.

106.    Visa, jointly with its issuing banks, and MasterCard, jointly with its issuing banks, each exercise market power in the market for merchant acceptance of debit cards.

107.    Visa and its issuing banks jointly have market power in the market for acceptance of debit cards.  Visa participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa-branded debit cards.  This combination of issuing banks combined with the Competitive Restraints gives Visa market power.  Visa has exercised and continues to exercise market power by requiring Plaintiffs to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

108.    Visa's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept Visa debit cards as a condition of accepting Visa credit cards was dropped in 2003, there is no evidence that merchants were able to stop accepting Visa debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that Visa's debit interchange rates were significantly above cost.  Because of Visa's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

109.    MasterCard and its issuing banks jointly have market power in the market for acceptance of debit cards.  MasterCard participates in and manages a combination comprised of a significant fraction of all issuers of debit cards, such that merchants are unable to refuse to accept MasterCard-branded debit cards.  This combination of issuing banks combined with the Competitive Restraints gives MasterCard market power.  MasterCard has exercised and continues to exercise market power by requiring Plaintiffs to pay supracompetitive interchange fees and by imposing the Competitive Restraints.

110.     MasterCard's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept MasterCard debit cards as a condition of accepting MasterCard credit cards was dropped in 2003, few or no merchants stopped accepting MasterCard debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011 the Federal Reserve Board found that MasterCard's debit interchange rates were significantly above cost.  Because of MasterCard's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

## COMPETITIVE INJURY

111.     Visa and MasterCard use their market power to impose "default" interchange fees and the Competitive Restraints on Plaintiffs.

112.     The Competitive Restraints make it impossible for the Plaintiffs to gain the benefits of competition as to the terms of acceptance, including lower interchange fees with individual issuing banks.  The Competitive Restraints provide a mechanism for issuing banks to avoid competing for acceptance.  Absent the supracompetitive "default" interchange fees and the other Competitive Restraints, Plaintiffs would be able to gain the benefits of competition as to interchange fees, which would reduce them to a competitive level.  The changes to the Competitive Restraints that were instituted as a result of prior settlements and enforcement actions have not eliminated the market power of the combinations and have not curtailed the level or rise in effective interchange fees being paid by merchants.  Since 2004, Plaintiffs' total interchange fees paid on transactions utilizing cards issued by members of Visa and MasterCard have risen faster than the rate of increase in retail sales.

113.     Each Plaintiff has been harmed by the actions of the Visa and MasterCard combinations.  The amount of interchange fees paid by each Plaintiff is supracompetitive.  The

high interchange fees levied on Plaintiffs lead to increased merchandise prices for consumers or otherwise diminish the value their customers receive. Thus, consumers, as well as merchants such as Plaintiffs, are harmed by the combinations' anticompetitive conduct, including the imposition of "default" interchange fees.

114.    But for the Competitive Restraints, competition among issuing banks for merchant acceptance would result in lower interchange fees. Each Plaintiff would have the opportunity to use the strategies it uses in other parts of its business to obtain competitive acceptance terms. As a result of the Competitive Restraints, card acceptance is a significant cost to Plaintiffs' businesses and they have no ability to gain lower costs in a competitive market.

115.    From 2004 to the present, Target has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Target has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

116.    From 2004 to the present, Macy's has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Macy's has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

117.    From 2004 to the present, TJX has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, TJX has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

118.    From 2004 to the present, Kohl's has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Kohl's has been forced to abide by Visa's and

MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

119.    From 2004 to the present, Staples has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Staples has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

120.    From 2004 to the present, JCPenney has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, JCPenney has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

121.    From 2004 to the present, Office Depot has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Office Depot has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

122.    From 2004 to the present, L Brands has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, L Brands has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

123.    From 2004 to the present, OfficeMax has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, OfficeMax has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

124. From 2004 to the present, Big Lots has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Big Lots has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

125. From 2004 to the present, Abercrombie & Fitch has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Abercrombie & Fitch has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

126. From 2004 to the present, Ascena through its subsidiaries has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Ascena through its subsidiaries has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

127. From 2004 to the present, Saks has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Saks has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

128. From 2004 to the present, Bon-Ton has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Bon-Ton has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

129. From 2004 to the present, Chico's has accepted Visa-branded and MasterCard-branded credit and debit cards. Accordingly, Chico's has been forced to abide by Visa's and

MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

130.    From 2004 to the present, Luxottica has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, Luxottica has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

131.    From 2004 to the present, American Signature has accepted Visa-branded and MasterCard-branded credit and debit cards.  Accordingly, American Signature has been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supracompetitive interchange fees, all to its detriment.

### CLAIMS FOR RELIEF

### Count 1:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Credit Cards

132.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 131 as if fully rewritten herein.

133.    The use of credit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

134.    Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Visa members.  Accordingly, by these arrangements, Visa has facilitated and

continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

135. In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

136. Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

137. As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

138. Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of Section 1 of the Sherman Act.

139. Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing

banks. Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards from its issuing banks on an all-or-nothing basis. Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks. By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants. But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

140. Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks. This further eliminates merchant acceptance as one of the areas of competition among issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

141. Visa's setting of "default" interchange fees for the acceptance of Visa-branded credit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market. Instead, Visa's supracompetitive interchange fees are set collectively by Visa in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default interchange" fees for Visa-

branded credit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuer.

142.     As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and decreased consumer welfare.

### Count 2:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Debit Cards

143.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 142 as if fully rewritten herein.

144.     The use of debit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

145.     Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the manager of a combination that limits competition between the bank members of the combination through the rules governing debit cards agreed to by Visa members.  Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant

-45-

acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly not to compete.

146.    In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn.  In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rule and agreements.

147.    Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

148.    As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of debit cards.

149.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

150.    Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the

issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks. By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants. But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

151.   Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks. Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

152.   Visa's setting of "default" interchange fees for the acceptance of Visa-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market. Instead, Visa's supracompetitive interchange fees have been set collectively by Visa in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for Visa-branded debit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

153.    The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of Visa's setting of "default" interchange fees.  While the damages suffered by Plaintiffs because of the imposition of supracompetitive debit interchange fees may be reduced by the regulatory maximums, the interchange fees being levied on Plaintiffs by the combination are still higher than they would be if there were active competition for merchant acceptance.  Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being forced to pay supracompetitive interchange fees on Visa debit card transactions.

154.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

**<u>Count 3:  Violation of Section 1 of the Sherman Act, Collectively and Separately, by MasterCard's Competitive Restraints Governing Credit Cards</u>**

155.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 154 as if fully rewritten herein.

156.    The use of credit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

157.    MasterCard and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior

-48-

to and after MasterCard's IPO.  MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by MasterCard members.  Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, similarly not to compete.

158.    In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn.  In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

159.    Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

160.    As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of general purpose credit cards.

161.    Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of MasterCard-branded credit cards and to prevent the

operation of and interfere with the competitive process with respect to the acceptance of credit cards, in violation of Section 1 of the Sherman Act.

162.    MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the cost of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

163.    MasterCard's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

164.    MasterCard's setting of "default" interchange fees for the acceptance of MasterCard-branded credit cards further prevents the cost of acceptance from being determined

between each Plaintiff and the various individual issuing banks in a competitive market. Instead, MasterCard's supracompetitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for MasterCard-branded credit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

165. As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of MasterCard's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

### Count 4: Violation of Section 1 of the Sherman Act, Collectively and Separately, by MasterCard's Competitive Restraints Governing Debit Cards

166. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 165 as if fully rewritten herein.

167. The use of debit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

168. MasterCard and its member banks are a combination within the meaning of Section 1 of the Sherman Act. MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the

rules governing debit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, to similarly not compete.

169. In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn. In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

170. Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

171. As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of debit cards.

172. Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix price of acceptance of MasterCard-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

173.    MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept MasterCard-branded cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the prices of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.

174.    MasterCard's Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

175.    MasterCard's setting of default interchange fees for the acceptance of MasterCard-branded debit cards further prevents the cost of acceptance from being determined between each Plaintiff and the various individual issuing banks in a competitive market.  Instead, MasterCard's supracompetitive interchange fees are set collectively by MasterCard in

conjunction with or on behalf of all of its member issuing banks. Absent the setting of "default" interchange fees for MasterCard-branded debit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

176.    The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of MasterCard's setting of "default" interchange fees. While the damages suffered by Plaintiffs because of the imposition of supracompetitive debit interchange fees may be reduced by regulatory maximums, the interchange fees being levied on Plaintiffs by the combination are still higher than they would be if there were active competition for merchant acceptance. Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being forced to pay supracompetitive interchange fees on MasterCard debit card transactions.

177.    As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of MasterCard's Competitive Restraints. The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Judgment in favor of each Plaintiff and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.    An award of the cost of the suit, including a reasonable attorney's fee; and

C.      Such other and further relief as the Court deems just, equitable, and proper.

CLARICK GUERON REISBAUM LLP

By: _____
        Gregory A. Clarick
        Nicole Gueron
        Isaac Zaur
        40 West 25th Street
        New York, New York 10010
        (212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

        Michael J. Canter
        Robert N. Webner
        James A. Wilson
        Douglas R. Matthews
        Kimberly Weber Herlihy
        Alycia N. Broz
        Kenneth J. Rubin
        52 East Gay Street
        Columbus, Ohio 43215
        (614) 464-6400

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

CLARICK GUERON REISBAUM LLP

By: _____

Gregory A. Clarick
Nicole Gueron
Isaac Zaur
40 West 25th Street
New York, New York 10010
(212) 633-4310

VORYS, SATER, SEYMOUR AND PEASE LLP

Michael J. Canter
Robert N. Webner
James A. Wilson
Douglas R. Matthews
Kimberly Weber Herlihy
Alycia N. Broz
Kenneth J. Rubin
52 East Gay Street
Columbus, Ohio 43215
(614) 464-6400

*Attorneys for Plaintiffs*

5/22/2013 16435563 V.12

# EXHIBIT A

| | |
|---|---|
| Fashion Bug of Audubon, Inc. | Lane Bryant Outlet #4168, LLC |
| Charming Shoppes of Trenton, Inc. | Lane Bryant Outlet #4171, LLC |
| Fashion Bug of Scranton Inc. | Lane Bryant Outlet #4174, Inc. |
| Fashion Bug of Harrisburg Inc. | Lane Bryant Outlet #4175, LLC |
| Fashion Bug of Franklin, Inc. | Lane Bryant Outlet #4179, LLC |
| Fashion Bug of Fairmont, Inc. | Lane Bryant Outlet #4182, LLC |
| Fashion Bug of Parkersburg, Inc. | Lane Bryant Outlet #4183, LLC |
| Fashion Bug of Uniontown, Inc. | Lane Bryant Outlet #4184, LLC |
| Fashion Bug of Hazleton, Inc. | Lane Bryant Outlet #4185, LLC |
| Fashion Bug of Brunswick, Inc. | Lane Bryant Outlet #4186, Inc. |
| Fashion Bug of Hagerstown, Inc. | Lane Bryant Outlet 4189, LLC |
| Fashion Bug of Ledgewood, Inc. | Lane Bryant Outlet 4237, Inc. |
| Fashion Bug of Lebanon, Inc. | Lane Bryant Outlet #4239 of Riverhead, LLC |
| Fashion Bug of Pottsville, Inc. | Lane Bryant Outlet #4240, LLC |
| Fashion Bug of Sharon, Inc. | Lane Bryant Outlet #4254, LLC |
| Fashion Bug of Lewisburg, Inc. | Lane Bryant Outlet #4272, LLC |
| Fashion Bug of Honesdale, Inc. | Lane Bryant Outlet #4279, Inc. |
| Fashion Bug of Altoona, Inc. | Lane Bryant Outlet #4320, LLC |
| Fashion Bug of New Philadelphia, Inc. | Lane Bryant Outlet #4322, LLC |
| Fashion Bug of Edgewood, Inc. | Lane Bryant Outlet 4324, Inc. |
| Fashion Bug of North Point, Inc. | Lane Bryant Outlet #4343, LLC |
| Fashion Bug #84 of Queens, Inc. | Lane Bryant #4503, LLC |
| Fashion Bug of West Mifflin, Inc. | Lane Bryant #4504, LLC |
| Fashion Bug of Elkton, Inc. | Lane Bryant #4506, LLC |
| Fashion Bug of Weirton, Inc. | Lane Bryant #4509, LLC |
| Fashion Bug of Chillicothe, Inc. | Lane Bryant 4510, Inc. |
| Fashion Bug of Chestertown, Inc. | Lane Bryant #4511, LLC |
| Fashion Bug of Morehead, Inc. | Lane Bryant #4512, LLC |
| Fashion Bug #108, Inc. | Lane Bryant #4515, LLC |
| Fashion Bug of Fredericksburg, Inc. | Lane Bryant #4518, LLC |
| Fashion Bug of Cuyahoga Falls, Inc. | Lane Bryant #4519, LLC |
| Fashion Bug of Edwardsville, Inc. | Lane Bryant #4520, LLC |
| Fashion Bug of Sharonville, Inc. | Lane Bryant 4521, Inc. |
| Fashion Bug of Portsmouth, Inc. | Lane Bryant #4522, Inc. |


| | |
|---|---|
| Fashion Bug of Audubon, Inc. | Lane Bryant Outlet #4168, LLC |
| Charming Shoppes of Trenton, Inc. | Lane Bryant Outlet #4171, LLC |
| Fashion Bug of Scranton Inc. | Lane Bryant Outlet #4174, Inc. |
| Fashion Bug of Harrisburg Inc. | Lane Bryant Outlet #4175, LLC |
| Fashion Bug of Franklin, Inc. | Lane Bryant Outlet #4179, LLC |
| Fashion Bug of Fairmont, Inc. | Lane Bryant Outlet #4182, LLC |
| Fashion Bug #2944, Inc. | Lane Bryant Outlet #4183, LLC |

EXHIBIT A

| | | |
|---|---|---|
| Fashion Bug of Eldersburg, Inc. | Fashion Bug #3049, Inc. | Lane Bryant 4523, LLC |
| Fashion Bug of Frankfort, Inc. | Fashion Bug #3050, Inc. | Lane Bryant #4524, LLC |
| Fashion Bug of Mt. Clemens, Inc. | Fashion Bug #3052, Inc. | Lane Bryant #4525, LLC |
| Fashion Bug of Paintsville, Inc. | Fashion Bug #3054, Inc. | Lane Bryant #4526, LLC |
| Fashion Bug of Youngstown, Inc. | Fashion Bug #3057, Inc. | Lane Bryant #4527, LLC |
| Fashion Bug of Pennsville, Inc. | Fashion Bug #3058, Inc. | Lane Bryant #4528, LLC |
| Fashion Bug #141, Inc. | Fashion Bug #3062, Inc. | Lane Bryant #4529, LLC |
| Fashion Bug of Walnutport, Inc. | Fashion Bug #3069, Inc. | Lane Bryant #4530, LLC |
| Fashion Bug #144, Inc. | Fashion Bug #3078, Inc. | Lane Bryant #4531, LLC |
| Fashion Bug of Warrenton, Inc. | Fashion Bug #3079, Inc. | Lane Bryant 4532, LLC |
| Fashion Bug of Mount Pleasant, Inc. | Fashion Bug #3081, Inc. | Lane Bryant #4533, LLC |
| Fashion Bug of Norwin, Inc. | Fashion Bug #3091, Inc. | Lane Bryant #4535, LLC |
| Fashion Bug of Monroe, Inc. | Fashion Bug #3092, Inc. | Lane Bryant 4536, Inc. |
| Fashion Bug of Belleville, Inc. | Fashion Bug #3094, Inc. | Lane Bryant #4539, LLC |
| Fashion Bug #157, Inc. | Fashion Bug #3099, Inc. | Lane Bryant #4541, LLC |
| Fashion Bug of Warren, Inc. | Fashion Bug #3102, Inc. | Lane Bryant #4542, LLC |
| Fashion Bug of Maple Heights, Inc. | Fashion Bug #3107, Inc. | Lane Bryant #4543, LLC |
| Fashion Bug of Williamsport, Inc. | Fashion Bug #3110, Inc. | Lane Bryant #4544, LLC |
| Fashion Bug of Lansing, Inc. | Fashion Bug #3114, Inc. | Lane Bryant #4545, LLC |
| Fashion Bug of Monroeville, Inc. | Fashion Bug #3115, Inc. | Lane Bryant #4546, LLC |
| Fashion Bug of Tech Plaza, Inc. | Fashion Bug #3116, Inc. | Lane Bryant #4547, LLC |
| Fashion Bug of Apple Valley Square, Inc. | Fashion Bug #3118, Inc. | Lane Bryant #4548, LLC |
| Fashion Bug of Waynesburg, Inc. | Fashion Bug #3120, Inc. | Lane Bryant 4549, Inc. |
| Fashion Bug of Danbury, Inc. | Fashion Bug #3121, Inc. | Lane Bryant #4551, LLC |
| Fashion Bug of East Mansfield, Inc. | Fashion Bug #3122, Inc. | Lane Bryant 4553, LLC |
| Fashion Bug of Allentown, Inc. | Fashion Bug #3123, Inc. | Lane Bryant #4554, LLC |
| Fashion Bug of Clarion, Inc. | Fashion Bug #3130, Inc. | Lane Bryant #4555, LLC |
| Fashion Bug of Dunbar, Inc. | Fashion Bug #3131, Inc. | Lane Bryant #4556, LLC |
| Fashion Bug of Barberton, Inc. | Fashion Bug #3133, Inc. | Lane Bryant #4557, LLC |
| Fashion Bug of Fullerton, Inc. | Fashion Bug #3134, Inc. | Lane Bryant #4558, LLC |
| Fashion Bug of Devon, Inc. | Fashion Bug #3137, Inc. | Lane Bryant #4560, LLC |
| Fashion Bug of Reisterstown, Inc. | Fashion Bug #3138, Inc. | Lane Bryant #4561, LLC |
| Fashion Bug of Whitman Plaza, Inc. | Fashion Bug #3139, Inc. | Lane Bryant #4562, LLC |
| Fashion Bug of Cranberry, Inc. | Fashion Bug #3140, Inc. | Lane Bryant #4563, LLC |

| | |
|---|---|
| Fashion Bug of Frackville, Inc. | Lane Bryant #4565, LLC |
| Fashion Bug of Aurora, Inc. | Lane Bryant #4566, LLC |
| Fashion Bug of Louisville, Inc. | Lane Bryant #4567, LLC |
| Fashion Bug of LaVale, Inc. | Lane Bryant #4568, LLC |
| Fashion Bug of Trumbull Plaza, Inc. | Lane Bryant #4569, LLC |
| Fashion Bug of Hamilton Square, Inc. | Lane Bryant #4570, LLC |
| Fashion Bug of Tunkhannock, Inc. | Lane Bryant #4571, LLC |
| Fashion Bug of Cape May, Inc. | Lane Bryant #4572, LLC |
| Fashion Bug of West Frankfort, Inc. | Lane Bryant #4573, LLC |
| Fashion Bug of Williamson, Inc. | Lane Bryant #4574, LLC |
| Fashion Bug of Clearview Mall, Inc. | Lane Bryant #4575, LLC |
| Fashion Bug of Ellwood City, Inc. | Lane Bryant/Cacique #4576, LLC |
| Fashion Bug #258, Inc. | Lane Bryant 4577, Inc. |
| Fashion Bug of Bond, Inc. | Lane Bryant 4578, Inc. |
| Fashion Bug of Fairfield, Inc. | Lane Bryant #4579, LLC |
| Fashion Bug #263, Inc. | Lane Bryant #4580, LLC |
| Fashion Bug #265, Inc. | Lane Bryant #4581, LLC |
| Fashion Bug of Bridgeview, Inc. | Lane Bryant #4582, LLC |
| Fashion Bug #279, Inc. | Lane Bryant #4583, LLC |
| Fashion Bug of Alpena, Inc. | Lane Bryant #4584, LLC |
| Fashion Bug of East Side Plaza, Inc. | Lane Bryant #4585, LLC |
| Fashion Bug of Dearborn, Inc. | Lane Bryant #4586, LLC |
| Fashion Bug of MacDade, Inc. | Lane Bryant/Cacique #4589, LLC |
| Fashion Bug of Iroquois Manor, Inc. | Lane Bryant/Cacique #4590, LLC |
| Fashion Bug of Dover Plaza, Inc. | Lane Bryant/Cacique #4591, LLC |
| F.B. Women's Apparel of Oneonta, Inc. | Lane Bryant/Cacique #4592 of Vestal, LLC |
| Fashion Bug of Rogers Plaza, Inc. | Lane Bryant/Cacique #4593, LLC |
| Fashion Bug of Middlesboro, Inc. | Lane Bryant #4594, LLC |
| Fashion Bug of College Square, Inc. | Lane Bryant/Cacique #4595, LLC |
| Fashion Bug of Howell, Inc. | Lane Bryant #4596, LLC |
| Fashion Bug of Woodbridge, Inc. | Lane Bryant/Cacique #4597, LLC |
| Fashion Bug of Bordentown, Inc. | Lane Bryant/Cacique #4598, LLC |
| Fashion Bug of Toms River, Inc. | Lane Bryant #4599, LLC |
| Fashion Bug of Kent, Inc. | Lane Bryant #4600, LLC |

| | |
|---|---|
| Fashion Bug of Wharton Square, Inc. | Lane Bryant/Cacique #4601, LLC |
| Fashion Bug of Saginaw, Inc. | Lane Bryant/Cacique #4602, LLC |
| Fashion Bug #336, Inc. | Lane Bryant/Cacique #4603, LLC |
| Fashion Bug of Fall River, Inc. | Lane Bryant/Cacique 4604, LLC |
| Fashion Bug of North Adams, Inc. | Lane Bryant/Cacique #4605, LLC |
| Fashion Bug of Norwell, Inc. | Lane Bryant/Cacique #4606, LLC |
| Fashion Bug of Lower Burrell, Inc. | Lane Bryant/Cacique #4608, LLC |
| Fashion Bug of Lakemore Plaza, Inc. | Lane Bryant/Cacique #4609, LLC |
| Fashion Bug of Glen Burnie, Inc. | Lane Bryant #4610, LLC |
| Fashion Bug of Cottman, Inc. | Lane Bryant #4612, LLC |
| Fashion Bug of North Brunswick, Inc. | Lane Bryant/Cacique #4614, LLC |
| Fashion Bug of East Park, Inc. | Lane Bryant #4616, LLC |
| Fashion Bug of Cambridge, Inc. | Lane Bryant #4617, LLC |
| Fashion Bug of Peoria, Inc. | Lane Bryant/Cacique 4619, Inc. |
| F.B. Women's Apparel of Delmar, Inc. | Lane Bryant #4620 of Saratoga County, LLC |
| Fashion Bug of Salem, Inc. | Lane Bryant #4622, LLC |
| F.B. Women's Apparel of Depew, Inc. | Lane Bryant/Cacique #4623, LLC |
| Fashion Bug of Ravenswood, Inc. | Lane Bryant/Cacique #4625, LLC |
| Fashion Bug of Thorndale, Inc. | Lane Bryant/Cacique #4630, LLC |
| Fashion Bug of Garfield Heights, Inc. | Lane Bryant/Cacique #4632, LLC |
| F.B. Women's Apparel of Panorama Plaza, Inc. | Lane Bryant #4633, LLC |
| Fashion Bug of Des Plaines, Inc. | Lane Bryant #4634, LLC |
| Fashion Bug of Lynn, Inc. | Lane Bryant/Cacique 4636, Inc. |
| Fashion Bug of Totowa, Inc. | Lane Bryant #4638, LLC |
| Fashion Bug of Bethlehem, Inc. | Lane Bryant/Cacique #4640, LLC |
| Fashion Bug of Midway, Inc. | Lane Bryant #4641, LLC |
| Fashion Bug of 640 Plaza, Inc. | Lane Bryant #4643, LLC |
| Fashion Bug of Manahawkin, Inc. | Lane Bryant/Cacique #4644, LLC |
| Fashion Bug of Troy, Inc. | Lane Bryant/Cacique #4645, LLC |
| Fashion Bug #418, Inc. | Lane Bryant #4646 of Horseheads, LLC |
| Fashion Bug of Amherst, Inc. | Lane Bryant #4647, LLC |
| Fashion Bug of St. Clair Shores, Inc. | Lane Bryant/Cacique #4648, LLC |
| Fashion Bug of Kutztown, Inc. | Lane Bryant/Cacique 4649, Inc. |
| Fashion Bug of New Holland, Inc. | Lane Bryant/Cacique #4650, LLC |

| | |
|---|---|
| Fashion Bug of Cleveland, Inc. | Lane Bryant #4652, LLC |
| Fashion Bug of Stratford, Inc. | Lane Bryant #4654, LLC |
| Fashion Bug of Valley Plaza, Inc. | Lane Bryant #4655, LLC |
| Fashion Bug of Webster, Inc. | Lane Bryant #4656, LLC |
| Fashion Bug of Williamstown, Inc. | Lane Bryant #4657, LLC |
| Fashion Bug of Revere, Inc. | Lane Bryant/Cacique #4659, LLC |
| Fashion Bug of East Hartford, Inc. | Lane Bryant/Cacique #4660, LLC |
| Fashion Bug of Springfield Plaza, Inc. | Lane Bryant/Cacique #4661, LLC |
| Fashion Bug of Johnston, Inc. | Lane Bryant #4664, LLC |
| Fashion Bug of Bolingbrook, Inc. | Lane Bryant #4665, LLC |
| Fashion Bug of Lynchburg, Inc. | Lane Bryant/Cacique #4667, LLC |
| Fashion Bug of Manchester, N.H., Inc. | Lane Bryant/Cacique #4668, LLC |
| Fashion Bug #455, Inc. | Lane Bryant/Cacique #4671, LLC |
| Fashion Bug of Midland Plaza, Inc. | Lane Bryant/Cacique #4672, LLC |
| Fashion Bug of Sturgis, Inc. | Lane Bryant #4676, LLC |
| Fashion Bug of Nashville, Inc. | Lane Bryant #4677, LLC |
| Fashion Bug of Freehold, Inc. | Lane Bryant #4679, Inc. |
| Fashion Bug of Mayfair, Inc. | Lane Bryant #4680, LLC |
| Fashion Bug #471, Inc. | Lane Bryant/Cacique #4681, LLC |
| Fashion Bug of Raynham, Inc. | Lane Bryant/Cacique #4683, LLC |
| Fashion Bug of Huntington Plaza, Inc. | Lane Bryant #4685, LLC |
| Fashion Bug of Highland Ridge, Inc. | Lane Bryant #4688, Inc. |
| Fashion Bug of North East, Inc. | Lane Bryant/Cacique 4689, Inc. |
| Fashion Bug of Cromwell Field, Inc. | Lane Bryant #4691, LLC |
| Fashion Bug of Culpepper, Inc. | Lane Bryant/Cacique #4692, LLC |
| Fashion Bug of Panama City, Inc. | Lane Bryant #4693, LLC |
| Fashion Bug of Palm Harbor, Inc. | Lane Bryant #4694, LLC |
| Fashion Bug of Glen Ellyn, Inc. | Lane Bryant #4696, LLC |
| Fashion Bug of Forest Plaza, Inc. | Lane Bryant #4697, LLC |
| Fashion Bug of Front Royal, Inc. | Lane Bryant #4700, LLC |
| Fashion Bug of Mason City, Inc. | Lane Bryant/Cacique #4701, LLC |
| Fashion Bug of New Britain, Inc. | Lane Bryant/Cacique #4702, LLC |
| Fashion Bug of Kedzie, Inc. | Lane Bryant #4705, LLC |
| Fashion Bug of Joliet, Inc. | Lane Bryant #4706, LLC |

| | |
|---|---|
| Fashion Bug of Marquette, Inc. | Fashion Bug #3340, Inc. | Lane Bryant #4709, LLC |
| Fashion Bug of Struthers, Inc. | Fashion Bug #3341 of Lockport, Inc. | Lane Bryant #4710, LLC |
| Fashion Bug #508, Inc. | Fashion Bug #3343, Inc. | Lane Bryant #4711, LLC |
| Fashion Bug of Lewiston, Inc. | Fashion Bug #3344, Inc. | Lane Bryant #4714, LLC |
| Fashion Bug of Warren Plaza, Inc. | Fashion Bug #3345, Inc. | Lane Bryant #4719, LLC |
| Fashion Bug of Montpelier, Inc. | Fashion Bug #3346, Inc. | Lane Bryant/Cacique #4720, LLC |
| Fashion Bug of Taylor, Inc. | Fashion Bug #3348, Inc. | Lane Bryant 4723, Inc. |
| Fashion Bug of Speedway Shopping Center, Inc. | Fashion Bug #3349, Inc. | Lane Bryant/Cacique #4724, LLC |
| Fashion Bug #519, Inc. | Fashion Bug #3351 of Rochester, Inc. | Lane Bryant #4727, LLC |
| Fashion Bug #520, Inc. | Fashion Bug #3352, Inc. | Lane Bryant #4733, LLC |
| Fashion Bug of Wilmington, Inc. | Fashion Bug #3353, Inc. | Lane Bryant #4734, INC. |
| Fashion Bug of Virginia Beach, Inc. | Fashion Bug #3359, Inc. | Lane Bryant #4736, LLC |
| Fashion Bug of Lorain, Inc. | Fashion Bug #3361, Inc. | Lane Bryant #4737, LLC |
| Fashion Bug of Gibbstown, Inc. | Fashion Bug #3362, Inc. | Lane Bryant 4740, Inc. |
| Fashion Bug #527, Inc. | Fashion Bug #3364, Inc. | Lane Bryant #4741, LLC |
| Fashion Bug of Rivertowne Commons, Inc. | Fashion Bug #3366, Inc. | Lane Bryant #4742, LLC |
| Fashion Bug of Bristol, Inc. | Fashion Bug #3373, Inc. | Lane Bryant #4743, LLC |
| Fashion Bug of Patchogue, Inc. | Fashion Bug #3379, Inc. | Lane Bryant #4744, Inc. |
| Fashion Bug 534, Inc. | Fashion Bug #3380, Inc. | Lane Bryant #4745, LLC |
| Fashion Bug of Somers Point, Inc. | Fashion Bug #3381, Inc. | Lane Bryant #4749, Inc. |
| Fashion Bug #538, Inc. | Fashion Bug #3382, Inc. | Lane Bryant #4750, LLC |
| Fashion Bug of University Plaza, Inc. | Fashion Bug #3383, Inc. | Lane Bryant #4751, LLC |
| Fashion Bug of Riverside Square, Inc. | Fashion Bug #3384, Inc. | Lane Bryant #4752, LLC |
| Fashion Bug #545, Inc. | Fashion Bug #3385, Inc. | Lane Bryant #4753, LLC |
| Fashion Bug of Bristol, CT, Inc. | Fashion Bug #3386, Inc. | Lane Bryant #4754, LLC |
| Fashion Bug #548, Inc. | Fashion Bug #3388, Inc. | Lane Bryant #4756, LLC |
| Fashion Bug of N. Roanoke, Inc. | Fashion Bug #3390, Inc. | Lane Bryant #4759, LLC |
| Fashion Bug of Waukegan, Inc. | Fashion Bug #3392, Inc. | Lane Bryant #4760, LLC |
| Fashion Bug of Charlottesville, Inc. | Fashion Bug #3393, Inc. | Lane Bryant #4761, Inc. |
| Fashion Bug of Gorham, Inc. | Fashion Bug #3395, Inc. | Lane Bryant #4762, LLC |
| Fashion Bug #560 of Gloversville, Inc. | Fashion Bug #3396, Inc. | Lane Bryant #4763, LLC |
| Fashion Bug #562, Inc. | Fashion Bug #3397, Inc. | Lane Bryant #4764, LLC |
| Fashion Bug #564, Inc. | Fashion Bug #3402, Inc. | Lane Bryant #4765, Inc. |
| Fashion Bug #566, Inc. | Fashion Bug #3403, Inc. | Lane Bryant 4766, Inc. |

| | |
|---|---|
| Fashion Bug #573, Inc. | Lane Bryant #4768, LLC |
| Fashion Bug #574 of Syracuse, Inc. | Lane Bryant #4769, LLC |
| Fashion Bug #575, Inc. | Lane Bryant #4770, LLC |
| Fashion Bug #576, Inc. | Lane Bryant #4772, LLC |
| Fashion Bug #580, Inc. | Lane Bryant #4773, Inc. |
| Fashion Bug #581, Inc. | Lane Bryant #4774, LLC |
| Fashion Bug #586, Inc. | Lane Bryant #4775, LLC |
| Fashion Bug #593 of Selden, Inc. | Lane Bryant #4776, LLC |
| Fashion Bug #594, Inc. | Lane Bryant #4777, LLC |
| Fashion Bug #596, Inc. | Lane Bryant #4778, Inc. |
| Fashion Bug #597, Inc. | Lane Bryant #4779, Inc. |
| Fashion Bug #601, Inc. | Lane Bryant #4780, LLC |
| Fashion Bug #602, Inc. | Lane Bryant #4781, Inc. |
| Fashion Bug #607, Inc. | Lane Bryant #4783, LLC |
| Fashion Bug #612, Inc. | Lane Bryant #4796 of Pelham Manor, LLC |
| Fashion Bug #615, Inc. | Lane Bryant #4797, LLC |
| Fashion Bug #617, Inc. | Lane Bryant 4800, Inc. |
| Fashion Bug #622, Inc. | Lane Bryant #4802, LLC |
| Fashion Bug #627, Inc. | Lane Bryant #4807, LLC |
| Fashion Bug #636, Inc. | Lane Bryant #4810, LLC |
| Fashion Bug #638, Inc. | Catherines #5013, LLC |
| Fashion Bug #642, Inc. | Catherines #5014, LLC |
| Fashion Bug #643 of Staten Island, Inc. | Catherines #5016, LLC |
| Fashion Bug #645, Inc. | Catherines #5022, LLC |
| Fashion Bug #647, Inc. | Catherines #5023, LLC |
| Fashion Bug #653, Inc. | Catherines #5029 of New Hartford, Inc. |
| Fashion Bug #654, Inc. | Catherines #5037, LLC |
| Fashion Bug #656, Inc. | Catherines #5039, Inc. |
| Fashion Bug #657, Inc. | Catherines #5044, LLC |
| Fashion Bug #658, Inc. | Catherines #5052, Inc. |
| Fashion Bug #661, Inc. | Catherines #5053, LLC |
| Fashion Bug #662, Inc. | Catherines #5054, LLC |
| Fashion Bug #663, Inc. | Catherines #5058, LLC |
| Fashion Bug #664, Inc. | Catherines #5063, LLC |

| | |
|---|---|
| Fashion Bug #3405 of Riverhead, Inc. | |
| Fashion Bug #3407, Inc. | |
| Fashion Bug #3408 of Hamburg, Inc. | |
| Fashion Bug #3409, Inc. | |
| Fashion Bug #3411, Inc. | |
| Fashion Bug #3413, Inc. | |
| Fashion Bug #3414, Inc. | |
| Fashion Bug #3415, Inc. | |
| Fashion Bug #3416, Inc. | |
| Fashion Bug #3420, Inc. | |
| Fashion Bug #3422, Inc. | |
| Fashion Bug #3423, Inc. | |
| Fashion Bug #3424, Inc. | |
| Fashion Bug #3425, Inc. | |
| Fashion Bug #3427, Inc. | |
| Fashion Bug #3429, Inc. | |
| Fashion Bug #3430, Inc. | |
| Fashion Bug #3432, Inc. | |
| Fashion Bug #3434, Inc. | |
| Fashion Bug #3435, Inc. | |
| Fashion Bug #3440, Inc. | |
| Fashion Bug #3441, Inc. | |
| Fashion Bug #3442 of Staten Island, Inc. | |
| Fashion Bug #3443, Inc. | |
| Fashion Bug #3445, Inc. | |
| Fashion Bug #3446, Inc. | |
| Fashion Bug #3448, Inc. | |
| Fashion Bug #3450, Inc. | |
| Fashion Bug #3451, Inc. | |
| Fashion Bug #3452, Inc. | |
| Fashion Bug #3453, Inc. | |
| Fashion Bug #3455, Inc. | |
| Fashion Bug #3456, Inc. | |
| Fashion Bug #3457, Inc. | |

| | |
|---|---|
| Fashion Bug #667, Inc. | Catherines #5069, LLC |
| Fashion Bug #670, Inc. | Catherines #5075, LLC |
| Fashion Bug #673, Inc. | Catherines #5076, LLC |
| Fashion Bug #674, Inc. | Catherines #5077, LLC |
| Fashion Bug #676 of Ozone Park, Inc. | Catherines #5085, LLC |
| Fashion Bug #679 of Watertown, Inc. | Catherines #5094, Inc. |
| Fashion Bug #681, Inc. | Catherines #5097, LLC |
| Fashion Bug #687, Inc. | Catherines #5114, LLC |
| Fashion Bug #689, Inc. | Catherines #5118, Inc. |
| Fashion Bug #691, Inc. | Catherines #5124, Inc. |
| Fashion Bug #693, Inc. | Catherines #5127, Inc. |
| Fashion Bug #694, Inc. | Catherines #5129, LLC |
| Fashion Bug #697, Inc. | Catherines #5134, LLC |
| Fashion Bug #698, Inc. | Catherines #5141, LLC |
| Fashion Bug #719, Inc. | Catherines #5147, Inc. |
| Fashion Bug #720 of Oswego, Inc. | Catherines #5149, Inc. |
| Fashion Bug #721, Inc. | Catherines #5150, LLC |
| Fashion Bug #724, Inc. | Catherines #5157, LLC |
| Fashion Bug #727, Inc. | Catherines #5163, LLC |
| Fashion Bug #729, Inc. | Catherines #5172, Inc. |
| Fashion Bug #732, Inc. | Catherines #5173, Inc. |
| Fashion Bug #733, Inc. | Catherines #5175, LLC |
| Fashion Bug #734 of Dunkirk, Inc. | Catherines #5176, LLC |
| Fashion Bug #740, Inc. | Catherines #5177, LLC |
| Fashion Bug #741, Inc. | Catherines #5179, Inc. |
| Fashion Bug #745, Inc. | Catherines #5188, LLC |
| Fashion Bug #748, Inc. | Catherines #5189, Inc. |
| Fashion Bug #752, Inc. | Catherines #5200, LLC |
| Fashion Bug #756, Inc. | Catherines #5215, LLC |
| Fashion Bug #757 of Brockport, Inc. | Catherines #5217, LLC |
| Fashion Bug #758, Inc. | Catherines #5220, LLC |
| Fashion Bug #759, Inc. | Catherines #5227, LLC |
| Fashion Bug #760 of Pine Plaza, Inc. | Catherines #5231, LLC |
| Fashion Bug #762, Inc. | Catherines #5232, LLC |

EXHIBIT A

| | |
|---|---|
| Fashion Bug #766, Inc. | Catherines #5239, LLC |
| Fashion Bug 768, Inc. | Catherines #5242, LLC |
| Fashion Bug #769, Inc. | Catherines #5247, LLC |
| Fashion Bug #772 of Middletown, Inc. | Catherines #5248, LLC |
| Fashion Bug #773, Inc. | Catherines #5267, Inc. |
| Fashion Bug #774, Inc. | Catherines #5269, LLC |
| Fashion Bug #775, Inc. | Catherines #5275, Inc. |
| Fashion Bug #776, Inc. | Catherines #5279, Inc. |
| Fashion Bug #778, Inc. | Catherines 5282, Inc. |
| Fashion Bug #787, Inc. | Catherines #5300, LLC |
| Fashion Bug #788, Inc. | Catherines #5303, LLC |
| Fashion Bug #793, Inc. | Catherines #5307, LLC |
| Fashion Bug #797, Inc. | Catherines #5335, LLC |
| Fashion Bug #799, Inc. | Catherines #5340, Inc. |
| Fashion Bug Plus #803, LLC | Catherines #5342, Inc. |
| Fashion Bug Plus #804, Inc. | Catherines #5344 of Mays Landing, Inc. |
| Fashion Bug Plus #807, LLC | Catherines #5345 of Colonial Heights, Inc. |
| Fashion Bug Plus of Frederick, Inc. | Catherines #5348, Inc. |
| Fashion Bug Plus of Turfland Mall, Inc. | Catherines #5349, Inc. |
| Fashion Bug Plus #863, Inc. | Catherines #5351, Inc. |
| F. B. Plus Women's Apparel of Kingston, Inc. | Catherines #5353, Inc. |
| Fashion Bug Plus of Baltimore, Inc. | Catherines #5356, Inc. |
| Fashion Bug Plus #932, Inc. | Catherines #5358, Inc. |
| Fashion Bug Plus of Mount Greenwood, Inc. | Catherines #5359, Inc. |
| Fashion Bug Plus #981, Inc. | Catherines #5360, Inc. |
| Fashion Bug Plus #985, Inc. | Catherines #5362, Inc. |
| Fashion Bug Plus #987, Inc. | Catherines #5363, Inc. |
| Fashion Bug Plus #991, Inc. | Catherines #5365, Inc. |
| Fashion Bug #2003, Inc. | Catherines #5368, Inc. |
| Fashion Bug #2004, Inc. | Catherines #5369, Inc. |
| Fashion Bug #2006, Inc. | Catherines #5370, Inc. |
| Fashion Bug #2009, Inc. | Catherines #5371, Inc. |
| Fashion Bug #2010, Inc. | Catherines #5372, Inc. |
| Fashion Bug #2011, Inc. | Catherines #5375, Inc. |

| | | |
|---|---|---|
| Fashion Bug #2015, Inc. | Fashion Bug #3588, Inc. | Catherines #5376, Inc. |
| Fashion Bug #2018, Inc. | Fashion Bug #3589, Inc. | Catherines #5377, Inc. |
| Fashion Bug #2020, Inc. | Fashion Bug #3591, Inc. | Catherines #5378, Inc. |
| Fashion Bug #2021, Inc. | Fashion Bug #3592, Inc. | Catherines #5380, Inc. |
| Fashion Bug #2022, Inc. | Fashion Bug #3593, Inc. | Catherines #5382 of Vestal, Inc. |
| Fashion Bug #2023 Inc. | Fashion Bug #3594, Inc. | Catherines #5384, Inc. |
| Fashion Bug #2027, Inc. | Fashion Bug #3595, Inc. | Catherines #5387, Inc. |
| Fashion Bug #2028, Inc. | Fashion Bug #3596, Inc. | Catherines #5388, Inc. |
| Fashion Bug #2029, Inc. | Fashion Bug #3597, Inc. | Catherines #5390, Inc. |
| Fashion Bug #2031, Inc. | Fashion Bug #3598, Inc. | Catherines #5396, Inc. |
| Fashion Bug #2030, Inc. | Fashion Bug #3599, Inc. | Catherines #5397, Inc. |
| Fashion Bug #2032, Inc. | Fashion Bug #3600, Inc. | Catherines #5402, Inc. |
| Fashion Bug #2034, Inc. | Fashion Bug #3601, Inc. | Catherines 5405, Inc. |
| Fashion Bug #2036, Inc. | Fashion Bug #3602, Inc. | Catherines 5406, Inc. |
| Fashion Bug #2037, Inc. | Fashion Bug #3603, Inc. | Catherines #5407, Inc. |
| Fashion Bug #2040, Inc. | Fashion Bug #3604, Inc. | Catherines #5408, Inc. |
| Fashion Bug of University Mall, Inc. | Fashion Bug #3605, Inc. | Catherines #5410, Inc. |
| Fashion Bug #2043, Inc. | Fashion Bug #3607, Inc. | Catherines #5411, Inc. |
| Fashion Bug #2044, Inc. | Fashion Bug #3608, Inc. | Catherines #5413 of Dewitt, Inc. |
| Fashion Bug #2045 of East Greenbush, Inc. | Fashion Bug #3609, Inc. | Catherines #5416, Inc. |
| Fashion Bug #2047, Inc. | Fashion Bug #3610, Inc. | Catherines #5420, LLC |
| Fashion Bug #2049, Inc. | Fashion Bug #3611, Inc. | Catherines #5427, Inc. |
| Fashion Bug #2050 of Massena, Inc. | Fashion Bug #3612, Inc. | Catherines #5428, Inc. |
| Fashion Bug #2051, Inc. | Fashion Bug #3613, Inc. | Catherines #5432, Inc. |
| Fashion Bug #2052, Inc. | Fashion Bug #3614, Inc. | Catherines #5434, LLC |
| Fashion Bug #2053, Inc. | Fashion Bug #3615 of Olean, Inc. | Catherines #5550, Inc. |
| Fashion Bug #2057, Inc. | Fashion Bug #3616, Inc. | Catherines #5552, Inc. |
| Fashion Bug #2058, Inc. | Fashion Bug #3617, Inc. | Catherines #5553, Inc. |
| Fashion Bug #2063, Inc. | Fashion Bug #3619, Inc. | Catherines #5555, Inc. |
| Fashion Bug #2070 of Brooklyn, Inc. | Fashion Bug #3621, Inc. | Catherines #5556, Inc. |
| Fashion Bug #2072 of Islandia, Inc. | Fashion Bug #3622, Inc. | Catherines #5557, LLC |
| Fashion Bug #2074, Inc. | Fashion Bug #3623, Inc. | Catherines #5558, LLC |
| Fashion Bug #2075, Inc. | Fashion Bug #3624, Inc. | Catherines #5559, LLC |
| Fashion Bug #2077, Inc. | Fashion Bug #3625, Inc. | Catherines #5560, LLC |

| | |
|---|---|
| Fashion Bug #2078, Inc. | Catherines #5561, LLC |
| Fashion Bug #2079, Inc. | Catherines #5562, LLC |
| Fashion Bug #2080, Inc. | Catherines #5563, LLC |
| Fashion Bug #2081 of Ogdensburg, Inc. | Catherines #5564, LLC |
| Fashion Bug #2082, Inc. | Catherines #5566, LLC |
| Fashion Bug #2084, Inc. | Catherines #5567, LLC |
| Fashion Bug #2085, Inc. | Catherines #5568, LLC |
| Fashion Bug #2086, Inc. | Catherines 5569, Inc. |
| Fashion Bug #2088, Inc. | Catherines #5570, LLC |
| Fashion Bug #2090, Inc. | Catherines #5571, LLC |
| Fashion Bug #2091, Inc. | Catherines #5572, LLC |
| Fashion Bug #2093, Inc. | Catherines #5573, LLC |
| Fashion Bug #2095, Inc. | Catherines #5574, LLC |
| Fashion Bug #2096, Inc. | Catherines #5575, LLC |
| Fashion Bug #2100 of Batavia, Inc. | Catherines #5578, LLC |
| Fashion Bug #2101, Inc. | Catherines #5579, LLC |
| Fashion Bug #2102, Inc. | Catherines #5580, LLC |
| Fashion Bug #2103, Inc. | Catherines #5582, LLC |
| Fashion Bug #2106 of Depew, Inc. | Catherines #5644, Inc. |
| Fashion Bug #2109, Inc. | Catherines #5646, Inc. |
| Fashion Bug 2113, Inc. | Catherines 5647, Inc. |
| Fashion Bug #2112, Inc. | Catherines #5648, Inc. |
| Fashion Bug #2115, Inc. | Catherines #5687, LLC |
| Fashion Bug #2118 of Newburgh, Inc. | Catherines #5702, LLC |
| Fashion Bug #2119, Inc. | Catherines #5706, Inc. |
| Fashion Bug #2120, Inc. | Catherines #5713, Inc. |
| Fashion Bug #2121, Inc. | Catherines #5717, LLC |
| Fashion Bug #2123, Inc. | Catherines #5718, Inc. |
| Fashion Bug #2124, Inc. | Catherines #5724, LLC |
| Fashion Bug 3660, Inc. | Catherines #5725, Inc. |
| Fashion Bug #2125, Inc. | Catherines #5738, Inc. |
| Fashion Bug #2126, Inc. | Catherines 5741, Inc. |
| Fashion Bug #2129, Inc. | Catherines #5742, Inc. |
| Fashion Bug #2131, Inc. | Catherines #5743, Inc. |
| Fashion Bug #2133, Inc. | |

| |
|---|
| Fashion Bug #3626, Inc. |
| Fashion Bug #3627 of Amherst, Inc. |
| Fashion Bug #3628, Inc. |
| Fashion Bug #3629, Inc. |
| Fashion Bug #3630, Inc. |
| Fashion Bug #3631, Inc. |
| Fashion Bug #3632, Inc. |
| Fashion Bug #3634, Inc. |
| Fashion Bug #3635, Inc. |
| Fashion Bug #3637, Inc. |
| Fashion Bug #3638, Inc. |
| Fashion Bug #3639, Inc. |
| Fashion Bug #3640, Inc. |
| Fashion Bug #3641, Inc. |
| Fashion Bug #3642, Inc. |
| Fashion Bug #3643, LLC |
| Fashion Bug #3644, LLC |
| Fashion Bug #3645, LLC |
| Fashion Bug #3646, LLC |
| Fashion Bug #3647, LLC |
| Fashion Bug 3649, Inc. |
| Fashion Bug #3650, LLC |
| Fashion Bug #3651, LLC |
| Fashion Bug #3653, LLC |
| Fashion Bug #3654, LLC |
| Fashion Bug #3655, LLC |
| Fashion Bug #3656, LLC |
| Fashion Bug #3657 of Dunkirk, LLC |
| Fashion Bug #3659, LLC |
| Fashion Bug #3661, LLC |
| Fashion Bug #3663, LLC |
| Fashion Bug #3664, LLC |
| Fashion Bug #3666, LLC |

| | | |
|---|---|---|
| Fashion Bug #2134, Inc. | Fashion Bug #3667, LLC | Catherines #5745, Inc. |
| Fashion Bug #2137, Inc. | Fashion Bug #3661, LLC | Catherines #5746, Inc. |
| Fashion Bug #2139, Inc. | Fashion Bug #3662, LLC | Catherines #5748, Inc. |
| Fashion Bug #2141, Inc. | Fashion Bug #3665, LLC | Catherines #5749 of Clay, Inc. |
| Fashion Bug #2145, Inc. | Fashion Bug #3668, LLC | Catherines #5751, LLC |
| Fashion Bug #2147, Inc. | Fashion Bug 3669, Inc. | Catherines #5753, Inc. |
| Fashion Bug #2148, Inc. | Fashion Bug #3671, LLC | Catherines #5757, Inc. |
| Fashion Bug #2149, Inc. | Fashion Bug #3673, LLC | Catherines #5772, LLC |
| Fashion Bug #2150, Inc. | Fashion Bug #3670, LLC | Catherines #5781, LLC |
| Fashion Bug #2151, Inc. | Fashion Bug #3674, LLC | Catherines #5784, LLC |
| Fashion Bug #2154, Inc. | Fashion Bug #3677, LLC | Catherines #5785, LLC |
| Fashion Bug #2155, Inc. | Fashion Bug #3678, LLC | Catherines #5786, LLC |
| Fashion Bug #2156, Inc. | Fashion Bug #3680, LLC | Catherines #5788, LLC |
| Fashion Bug #2157 of Oneida, Inc. | Fashion Bug #3679, LLC | Catherines #5791, LLC |
| Fashion Bug #2158, Inc. | Fashion Bug #3682, LLC | Catherines #5793, Inc. |
| Fashion Bug #2162, Inc. | Fashion Bug #3685, LLC | Catherines #5794 of Pittsford, Inc. |
| Fashion Bug #2166, Inc. | Fashion Bug 3690, LLC | Catherines #5796 of Poughkeepsie, Inc. |
| Fashion Bug #2169, Inc. | Fashion Bug 3694, Inc. | Catherines #5802, LLC |
| Fashion Bug #2170, Inc. | Fashion Bug #3695, LLC | Catherines #5808, LLC |
| Fashion Bug #2171, Inc. | Fashion Bug 3697, Inc. | Catherines #5812, Inc. |
| Fashion Bug #2173, Inc. | Fashion Bug #3704, LLC | Catherines #5814, LLC |
| Fashion Bug #2174, Inc. | Fashion Bug #3705, LLC | Catherines #5816, LLC |
| Fashion Bug #2175, Inc. | Fashion Bug #3706, LLC | Catherines #5817 of Amherst, LLC |
| Fashion Bug #2181, Inc. | Fashion Bug #3708, LLC | Catherines #5819, Inc. |
| Fashion Bug #2182, Inc. | Fashion Bug #3709, LLC | Catherines #5824, LLC |
| Fashion Bug #2183, Inc. | Fashion Bug 3711, Inc. | Catherines 5832, Inc. |
| Fashion Bug #2184 of Webster, Inc. | Fashion Bug #3712, LLC | Catherines 5834, Inc. |
| Fashion Bug #2185, Inc. | Fashion Bug #3713, LLC | Catherines #5837, LLC |
| Fashion Bug #2186, Inc. | Fashion Bug #3684, LLC | Catherines #5845, Inc. |
| Fashion Bug #2187, Inc. | Fashion Bug #3686, LLC | Catherines #5848, Inc. |
| Fashion Bug #2189, Inc. | Fashion Bug #3689 of Johnstown, LLC | Catherines #5849, Inc. |
| Fashion Bug #2190, Inc. | Fashion Bug #3691, LLC | Catherines #5857, Inc. |
| Fashion Bug #2192, Inc. | Fashion Bug 3692, Inc. | Catherines #5858, Inc. |
| Fashion Bug #2193, Inc. | Fashion Bug #3724, LLC | Catherines #5859, Inc. |

| | | |
|---|---|---|
| Fashion Bug #2194, Inc. | Fashion Bug #3726, LLC | Catherines #5861, Inc. |
| Fashion Bug #2195, Inc. | Fashion Bug #3728, LLC | Catherines #5863, Inc. |
| Fashion Bug #2196 of Newark, Inc. | Fashion Bug #3729, LLC | Catherines #5867, Inc. |
| Fashion Bug #2199, Inc. | Fashion Bug #3730, LLC | Catherines #5871, Inc. |
| Fashion Bug #2203, Inc. | Fashion Bug #3735, LLC | Catherines #5873, Inc. |
| Fashion Bug #2204 of Hornell, Inc. | Fashion Bug #3739, LLC | Catherines #5874, Inc. |
| Fashion Bug #2206, Inc. | Fashion Bug #3740, LLC | Catherines #5875, Inc. |
| Fashion Bug #2209, Inc. | Fashion Bug #3696, LLC | Catherines #5876, Inc. |
| Fashion Bug #2210 of Kingston, Inc. | Fashion Bug #3701, LLC | Catherines #5879, Inc. |
| Fashion Bug #2212, Inc. | Fashion Bug #3702, LLC | Catherines #5881, Inc. |
| Fashion Bug #2214, Inc. | Fashion Bug #3703, LLC | Catherines #5885, Inc. |
| Fashion Bug #2215, Inc. | Fashion Bug #3707, LLC | Catherines #5889, Inc. |
| Fashion Bug #2220, Inc. | Fashion Bug #3710, LLC | Catherines #5890, Inc. |
| Fashion Bug #2221, Inc. | Fashion Bug 3714, Inc. | Catherines #5893, Inc. |
| Fashion Bug #2222, Inc. | Fashion Bug #3716, LLC | Catherines #5951, LLC |
| Fashion Bug #2224, Inc. | Fashion Bug #3723, LLC | Catherines #5952, LLC |
| Fashion Bug #2226, Inc. | Fashion Bug #3725, LLC | Catherines #5955, LLC |
| Fashion Bug #2227, Inc. | Fashion Bug #3734, LLC | Catherines #5956, LLC |
| Fashion Bug #2228, Inc. | Fashion Bug #3736, LLC | Catherines #5957, LLC |
| Fashion Bug #2230, Inc. | Fashion Bug 3741, Inc. | Catherines #5958, LLC |
| Fashion Bug #2231, Inc. | Fashion Bug #3742, LLC | Catherines #5959, LLC |
| Fashion Bug #2232, Inc. | Fashion Bug #3743, LLC | Catherines #5960, LLC |
| Fashion Bug #2233, Inc. | Fashion Bug #3744, LLC | Catherines #5961, LLC |
| Fashion Bug #2235, Inc. | Fashion Bug #3745, LLC | Catherines #5962, LLC |
| Fashion Bug #2237, Inc. | Fashion Bug #3746, LLC | Catherines #5963, LLC |
| Fashion Bug #2238, Inc. | Fashion Bug #3747, LLC | Catherines #5965, LLC |
| Fashion Bug #2239, Inc. | Fashion Bug #3748, LLC | Catherines #5966, LLC |
| Fashion Bug #2240, Inc. | Fashion Bug #3749, LLC | Catherines #5967, LLC |
| Fashion Bug #2242, Inc. | Fashion Bug #3751, LLC | Catherines #5968, LLC |
| Fashion Bug #2243, Inc. | Fashion Bug #3753, LLC | Catherines #5969, LLC |
| Fashion Bug #2244 of Canandaigua, Inc. | Fashion Bug #3754, LLC | Catherines 5970, LLC |
| Fashion Bug #2245, Inc. | Fashion Bug #3755, LLC | Catherines #5971, LLC |
| Fashion Bug #2247, Inc. | Fashion Bug 3756, Inc. | Catherines #5972, LLC |
| Fashion Bug #2249, Inc. | Fashion Bug 3757, Inc. | Catherines #5973, LLC |

| | | |
|---|---|---|
| Fashion Bug #2254, Inc. | Fashion Bug #3758, LLC | Catherines #5974, LLC |
| Fashion Bug #2255, Inc. | Fashion Bug #3759, LLC | Catherines 5975, Inc. |
| Fashion Bug #2257, Inc. | Fashion Bug #4002, Inc. | Catherines #5976, LLC |
| Fashion Bug #2258, Inc. | Fashion Bug #4004, Inc. | Catherines #5977, LLC |
| Fashion Bug #2259, Inc. | Fashion Bug #4008, Inc. | Catherines #5979, LLC |
| Fashion Bug #2260, Inc. | Fashion Bug #4010, Inc. | Catherines #5980, LLC |
| Fashion Bug #2263, Inc. | Fashion Bug #4011, Inc. | Catherines #5982, LLC |
| Fashion Bug #2264, Inc. | Fashion Bug #4012, Inc. | Catherines #5983, LLC |
| Fashion Bug #2266, Inc. | Fashion Bug #4013, Inc. | Lane Bryant #6004, LLC |
| Fashion Bug #2275, Inc. | Lane Bryant Outlet 4124, LLC | Lane Bryant #6008, Inc. |
| Fashion Bug #2278, Inc. | Lane Bryant Outlet #4127, LLC | Lane Bryant #6012, LLC |
| Fashion Bug #2279, Inc. | Lane Bryant Outlet #4157/Petite Sophisticate Outlet, LLC | Lane Bryant #6013, LLC |
| Fashion Bug #2280, Inc. | Lane Bryant Outlet 4164, LLC | Lane Bryant #6017, LLC |
| Fashion Bug #2281, Inc. | Lane Bryant Outlet #4172 of Dunkirk, LLC | Lane Bryant #6019, LLC |
| Fashion Bug #2284, Inc. | Lane Bryant Outlet #4173, LLC | Lane Bryant #6032, LLC |
| Fashion Bug #2285, Inc. | Lane Bryant Outlet #4191, LLC | Lane Bryant 6038, Inc. |
| Fashion Bug #2289 of Garden City, Inc. | Petite Sophisticate Outlet #4408, LLC | Lane Bryant #6041, LLC |
| Fashion Bug #2290, Inc. | Lane Bryant #4501, LLC | Lane Bryant 6042, Inc. |
| Fashion Bug #2291, Inc. | Lane Bryant #4505, LLC | Lane Bryant 6044, Inc. |
| Fashion Bug #2292, Inc. | Lane Bryant #4507, LLC | Lane Bryant 6045, Inc. |
| Fashion Bug #2293, Inc. | Lane Bryant #4508, LLC | Lane Bryant #6046, LLC |
| Fashion Bug #2295, Inc. | Lane Bryant #4516, LLC | Lane Bryant #6051, LLC |
| Fashion Bug #2296, Inc. | Lane Bryant #4537, LLC | Lane Bryant #6053, LLC |
| Fashion Bug #2297, Inc. | Lane Bryant #4538, LLC | Lane Bryant #6059, LLC |
| Fashion Bug #2299, Inc. | Lane Bryant #4552, LLC | Lane Bryant #6065, LLC |
| Fashion Bug #2301, Inc. | Lane Bryant #4559, LLC | Lane Bryant 6067, Inc. |
| Fashion Bug #2304, Inc. | Lane Bryant #4618, LLC | Lane Bryant #6078, LLC |
| Fashion Bug #2305, Inc. | Lane Bryant/Cacique #4621, LLC | Lane Bryant #6083, Inc. |
| Fashion Bug #2309, Inc. | Lane Bryant #4629, LLC | Lane Bryant #6097, LLC |
| Fashion Bug #2313, Inc. | Lane Bryant #4631, LLC | Lane Bryant #6116, LLC |
| Fashion Bug #2314, Inc. | Lane Bryant/Cacique #4637, LLC | Lane Bryant #6118, LLC |
| Fashion Bug #2315, Inc. | Lane Bryant #4658, LLC | Lane Bryant #6120, Inc. |
| Fashion Bug #2322, Inc. | Lane Bryant #4663, LLC | Lane Bryant 6122, Inc. |

| | |
|---|---|
| Fashion Bug #2325, Inc. | Lane Bryant #4666, LLC | Lane Bryant #6126, LLC |
| Fashion Bug #2326, Inc. | Lane Bryant/Cacique #4669, LLC | Lane Bryant 6134, Inc. |
| Fashion Bug #2328, Inc. | Lane Bryant #4673, LLC | Lane Bryant #6147 of Victor, LLC |
| Fashion Bug #2330, Inc. | Lane Bryant 4682, Inc. | Lane Bryant #6154, LLC |
| Fashion Bug #2332, Inc. | Lane Bryant #4686, LLC | Lane Bryant #6155, LLC |
| Fashion Bug #2335, Inc. | Lane Bryant #4687, LLC | Lane Bryant #6157, Inc. |
| Fashion Bug #2337, Inc. | Lane Bryant #4695, LLC | Lane Bryant #6158, LLC |
| Fashion Bug #2339, Inc. | Lane Bryant #4704, LLC | Lane Bryant 6161, Inc. |
| Fashion Bug #2345, Inc. | Lane Bryant #4717, LLC | Lane Bryant #6163, LLC |
| Fashion Bug #2347, Inc. | Lane Bryant #4738, LLC | Lane Bryant #6166, LLC |
| Fashion Bug #2340, Inc. | Lane Bryant #4767, LLC | Lane Bryant #6170, LLC |
| Fashion Bug #2343, Inc. | Lane Bryant #4782, LLC | Lane Bryant #6178, LLC |
| Fashion Bug #2348, Inc. | Lane Bryant #4793, LLC | Lane Bryant #6181, Inc. |
| Fashion Bug #2349, Inc. | Lane Bryant #4798, LLC | Lane Bryant #6183, LLC |
| Fashion Bug #2350, Inc. | Lane Bryant #4803, LLC | Lane Bryant #6188, LLC |
| Fashion Bug #2351, Inc. | Lane Bryant 4804, Inc. | Lane Bryant #6196, Inc. |
| Fashion Bug #2353, Inc. | Lane Bryant #4805, LLC | Lane Bryant #6202, LLC |
| Fashion Bug #2354, Inc. | Lane Bryant #4806, LLC | Lane Bryant/Cacique #6203, LLC |
| Fashion Bug #2355, Inc. | Lane Bryant #4808 of Westbury, LLC | Lane Bryant #6205, LLC |
| Fashion Bug #2357, Inc. | Lane Bryant #4811, LLC | Lane Bryant #6209, LLC |
| Fashion Bug #2359, Inc. | Lane Bryant #4812, LLC | Lane Bryant #6211, LLC |
| Fashion Bug #2360, Inc. | Catherines #5043, Inc. | Lane Bryant #6213, LLC |
| Fashion Bug #2362, Inc. | Catherines #5053, LLC | Lane Bryant #6215, Inc. |
| Fashion Bug #2364 of North Tonawanda, Inc. | Catherines #5110, LLC | Lane Bryant #6218, Inc. |
| Fashion Bug #2369, Inc. | Catherines #5111, Inc. | Lane Bryant #6219, LLC |
| Fashion Bug #2370 of Malone, Inc. | Catherines #5116, Inc. | Lane Bryant #6222, LLC |
| Fashion Bug #2374, Inc. | Catherines #5143, Inc. | Lane Bryant #6230, Inc. |
| Fashion Bug #2375, Inc. | Catherines #5144, Inc. | Lane Bryant #6231, LLC |
| Fashion Bug #2376, Inc. | Catherines #5145, Inc. | Lane Bryant #6234, LLC |
| Fashion Bug #2378, Inc. | Catherines #5151 of Big Flats, Inc. | Lane Bryant #6238, Inc. |
| Fashion Bug #2380, Inc. | Catherines #5152, LLC | Lane Bryant #6243, Inc. |
| Fashion Bug #2384 of Rochester, Inc. | Catherines #5156, Inc. | Lane Bryant #6245, Inc. |
| Fashion Bug #2385, Inc. | Catherines #5186, Inc. | Lane Bryant #6248, Inc. |
| Fashion Bug #2389, Inc. | Catherines #5210, Inc. | Lane Bryant #6249, LLC |

| | | |
|---|---|---|
| Fashion Bug #2393, Inc. | Catherines 5257, LLC | Lane Bryant #6251, Inc. |
| Fashion Bug #2394, Inc. | Catherines #5268, Inc. | Lane Bryant #6257 of Staten Island, LLC |
| Fashion Bug #2395, Inc. | Catherines #5314 of Greenburgh, LLC | Lane Bryant #6260, Inc. |
| Fashion Bug #2396 of Big Flats, Inc. | Catherines #5322 of Staten Island, LLC | Lane Bryant 6261, Inc. |
| Fashion Bug #2397, Inc. | Catherines #5336, LLC | Lane Bryant #6264, LLC |
| Fashion Bug #2398, Inc. | Catherines #5337, LLC | Lane Bryant #6271, Inc. |
| Fashion Bug #2399, Inc. | Catherines #5343, Inc. | Lane Bryant #6278, LLC |
| Fashion Bug #2403, Inc. | Catherines #5350, Inc. | Lane Bryant #6280 of Levittown, LLC |
| Fashion Bug #2406, Inc. | Catherines #5355, Inc. | Lane Bryant #6282, LLC |
| Fashion Bug #2407, Inc. | Catherines #5357, Inc. | Lane Bryant #6290, LLC |
| Fashion Bug #2409, Inc. | Catherines #5361, Inc. | Lane Bryant #6291, LLC |
| Fashion Bug #2411, Inc. | Catherines #5364 of Buffalo, Inc. | Lane Bryant #6294, LLC |
| Fashion Bug #2412, Inc. | Catherines #5366, Inc. | Lane Bryant #6295, Inc. |
| Fashion Bug #2415, Inc. | Catherines #5367 of Middletown, Inc. | Lane Bryant #6298, LLC |
| Fashion Bug #2416, Inc. | Catherines #5373, Inc. | Lane Bryant #6301, LLC |
| Fashion Bug #2420, Inc. | Catherines #5381, Inc. | Lane Bryant #6302, LLC |
| Fashion Bug #2421, LLC | Catherines #5383, Inc. | Lane Bryant/Cacique #6304 of Albany, LLC |
| Fashion Bug #2423, Inc. | Catherines #5386, Inc. | Lane Bryant #6315 of Bayshore, Inc. |
| Fashion Bug #2424, Inc. | Catherines #5391, Inc. | Lane Bryant 6319, Inc. |
| Fashion Bug #2425, Inc. | Catherines #5395, Inc. | Lane Bryant #6321, LLC |
| Fashion Bug #2426 of East Aurora, Inc. | Catherines #5404, Inc. | Lane Bryant 6324, Inc. |
| Fashion Bug #2432, Inc. | Catherines 5409, Inc. | Lane Bryant 6328, Inc. |
| Fashion Bug #2435, Inc. | Catherines #5412, Inc. | Lane Bryant 6330, Inc. |
| Fashion Bug #2436, Inc. | Catherines 5414, Inc. | Lane Bryant #6336, LLC |
| Fashion Bug #2437, Inc. | Catherines #5424, LLC | Lane Bryant #6341, LLC |
| Fashion Bug #2439, Inc. | Catherines #5433, LLC | Lane Bryant #6342, Inc. |
| Fashion Bug #2440, Inc. | Catherines #5554 of Spring Valley, Inc. | Lane Bryant #6345, LLC |
| Fashion Bug #2446, Inc. | Catherines 5565, LLC | Lane Bryant #6350, LLC |
| Fashion Bug #2449, Inc. | Catherines #5577, LLC | Lane Bryant #6353, LLC |
| Fashion Bug #2452, Inc. | Catherines #5583, LLC | Lane Bryant/Cacique #6354, LLC |
| Fashion Bug #2453, Inc. | Catherines #5645, Inc. | Lane Bryant #6365, LLC |
| Fashion Bug #2455 of Wilton, Inc. | Catherines #5649, Inc. | Lane Bryant #6366, Inc. |
| Fashion Bug #2458, Inc. | Catherines #5711, Inc. | Lane Bryant #6369, Inc. |
| Fashion Bug #2459, Inc. | Catherines #5758 of Carle Place, LLC | Lane Bryant #6371, Inc. |

| | | |
|---|---|---|
| Fashion Bug #2460, Inc. | Catherines 5774, Inc. | Lane Bryant #6372, Inc. |
| Fashion Bug #2466, Inc. | Catherines #5778, Inc. | Lane Bryant #6373 of Shirley, Inc. |
| Fashion Bug #2468 of Bath, Inc. | Catherines #5825, LLC | Lane Bryant #6374, Inc. |
| Fashion Bug #2470 of Binghamton, Inc. | Catherines #5826, Inc. | Lane Bryant/Cacique #6375, LLC |
| Fashion Bug #2472, Inc. | Catherines 5831, Inc. | Lane Bryant #6385, Inc. |
| Fashion Bug #2473, Inc. | Catherines #5843, Inc. | Lane Bryant/Cacique #6387, LLC |
| Fashion Bug #2474, Inc. | Catherines #5846, Inc. | Lane Bryant #6388, LLC |
| Fashion Bug #2476 of Middle Island, Inc. | Catherines #5850 of Syracuse, Inc. | Lane Bryant #6390, LLC |
| Fashion Bug #2485, Inc. | Catherines #5851, Inc. | Lane Bryant 6391, Inc. |
| Fashion Bug #2488, Inc. | Catherines #5852, Inc. | Lane Bryant #6392, LLC |
| Fashion Bug #2492, Inc. | Catherines #5855, Inc. | Lane Bryant 6394, Inc. |
| Fashion Bug #2497, Inc. | Catherines #5856, Inc. | Lane Bryant 6398, Inc. |
| Fashion Bug #2505 of Hudson, Inc. | Catherines #5860, Inc. | Lane Bryant #6399, LLC |
| Fashion Bug #2508, Inc. | Catherines #5862, Inc. | Lane Bryant #6401, Inc. |
| Fashion Bug #2510, Inc. | Catherines #5869 of Rotterdam, Inc. | Lane Bryant #6404, Inc. |
| Fashion Bug #2511, Inc. | Catherines #5888, Inc. | Lane Bryant 6405, LLC |
| Fashion Bug #2512, Inc. | Catherines #5891, Inc. | Lane Bryant #6406, Inc. |
| Fashion Bug #2513, Inc. | Catherines #5892, Inc. | Lane Bryant #6409, Inc. |
| Fashion Bug #2518, Inc. | Catherines #5954, LLC | Lane Bryant #6417, LLC |
| Fashion Bug #2519 of Fulton, Inc. | Catherines #5964, LLC | Lane Bryant #6419, LLC |
| Fashion Bug #2523, Inc. | Catherines #5981, LLC | Lane Bryant #6420, Inc. |
| Fashion Bug #2524, Inc. | Catherines #5986, LLC | Lane Bryant #6421, Inc. |
| Fashion Bug #2529, Inc. | Lane Bryant #6001, LLC | Lane Bryant #6432, inc. |
| Fashion Bug #2531, Inc. | Lane Bryant #6002 of Brooklyn, LLC. | Lane Bryant #6433, Inc. |
| Fashion Bug #2533, Inc. | Lane Bryant #6005, LLC | Lane Bryant #6435, LLC |
| Fashion Bug #2534, Inc. | Lane Bryant #6006, LLC | Lane Bryant #6446, LLC |
| Fashion Bug #2537, Inc. | Lane Bryant #6007, Inc. | Lane Bryant #6456, Inc. |
| Fashion Bug #2538, Inc. | Lane Bryant #6010, Inc. | Lane Bryant #6457 of Buffalo, Inc. |
| Fashion Bug #2540, Inc. | Lane Bryant #6021, LLC | Lane Bryant #6461, Inc. |
| Fashion Bug #2542, Inc. | Lane Bryant #6028 of Elmhurst, LLC | Lane Bryant #6464, Inc. |
| Fashion Bug #2551 of Clay, Inc. | Lane Bryant #6039, LLC | Lane Bryant #6466, Inc. |
| Fashion Bug #2553, Inc. | Lane Bryant #6075, LLC | Lane Bryant #6470, LLC |
| Fashion Bug #2554, Inc. | Lane Bryant #6077, LLC | Lane Bryant #6474, LLC |
| Fashion Bug #2555, Inc. | Lane Bryant #6081, LLC | Lane Bryant #6478, Inc. |

| Fashion Bug #2556, Inc. | Lane Bryant #6084, LLC | Lane Bryant #6481, LLC |
| Fashion Bug #2561, Inc. | Lane Bryant #6088 of Cortlandt, Inc. | Lane Bryant #6484, LLC |
| Fashion Bug #2562, Inc. | Lane Bryant #6102, LLC | Lane Bryant #6490, LLC |
| Fashion Bug #2568, Inc. | Lane Bryant #6114, LLC | Lane Bryant #6491, LLC |
| Fashion Bug #2571, Inc. | Lane Bryant 6130, Inc. | Lane Bryant #6494, LLC |
| Fashion Bug #2574, Inc. | Lane Bryant #6149, Inc. | Lane Bryant 6496, LLC |
| Fashion Bug #2575, Inc. | Lane Bryant #6177, LLC | Lane Bryant #6499, LLC |
| Fashion Bug #2578, Inc. | Lane Bryant #6179, LLC | Lane Bryant/Cacique #6518, LLC |
| Fashion Bug #2579, Inc. | Lane Bryant #6185, LLC | Lane Bryant #6521, LLC |
| Fashion Bug #2580, Inc. | Lane Bryant #6192, LLC | Lane Bryant #6522, LLC |
| Fashion Bug #2582, Inc. | Lane Bryant 6198, Inc. | Lane Bryant 6525, LLC |
| Fashion Bug #2584 of Cortland, Inc. | Lane Bryant #6226, Inc. | Lane Bryant 6529, Inc. |
| Fashion Bug #2585, Inc. | Lane Bryant #6227, LLC | Lane Bryant #6537, LLC |
| Fashion Bug #2586, Inc. | Lane Bryant #6228, LLC | Lane Bryant #6540, Inc. |
| Fashion Bug #2587, Inc. | Lane Bryant 6265, Inc. | Lane Bryant #6541, LLC |
| Fashion Bug #2593, Inc. | Lane Bryant #6288, LLC | Lane Bryant #6542, Inc. |
| Fashion Bug #2594, Inc. | Lane Bryant #6300, Inc. | Lane Bryant 6543, Inc. |
| Fashion Bug #2597 of Colonie, Inc. | Lane Bryant 6310, Inc. | Lane Bryant 6547, Inc. |
| Fashion Bug #2601, Inc. | Lane Bryant 6318, Inc. | Lane Bryant 6558, Inc. |
| Fashion Bug #2603, Inc. | Lane Bryant #6329, Inc. | Lane Bryant #6563 of New Hartford, LLC |
| Fashion Bug #2604 of Vestal, Inc. | Lane Bryant #6331, LLC | Lane Bryant #6565, LLC |
| Fashion Bug #2605, Inc. | Lane Bryant #6344, Inc. | Lane Bryant #6566, LLC |
| Fashion Bug #2608, Inc. | Lane Bryant #6355, LLC | Lane Bryant #6570, LLC |
| Fashion Bug #2609, Inc. | Lane Bryant #6358, Inc. | Lane Bryant 6575, Inc. |
| Fashion Bug #2610, Inc. | Lane Bryant #6384, Inc. | Lane Bryant #6577, LLC |
| FASHION BUG #2613, INC. | Lane Bryant 6396, LLC | Lane Bryant/Cacique #6579, LLC |
| Fashion Bug #2616, Inc. | Lane Bryant #6397, Inc. | Lane Bryant #6581, LLC |
| Fashion Bug #2617, Inc. | Lane Bryant #6402, Inc. | Lane Bryant #6582, LLC |
| Fashion Bug #2619, Inc. | Lane Bryant #6407, Inc. | Lane Bryant #6586, LLC |
| Fashion Bug #2621, Inc. | Lane Bryant #6428, LLC | Lane Bryant #6587, LLC |
| Fashion Bug #2627 of West Seneca, Inc. | Lane Bryant #6431, Inc. | Lane Bryant #6588, LLC |
| Fashion Bug #2629, Inc. | Lane Bryant #6436, Inc. | Lane Bryant #6603, LLC |
| Fashion Bug #2635 of Geneseo, Inc. | Lane Bryant #6442, LLC | Lane Bryant #6606, LLC |
| Fashion Bug #2636, Inc. | Lane Bryant #6458, Inc. | Lane Bryant #6615, LLC |

EXHIBIT A

| | | |
|---|---|---|
| Fashion Bug #2649, Inc. | Lane Bryant #6469, LLC | Lane Bryant #6617, LLC |
| Fashion Bug #2650, Inc. | Lane Bryant #6479, LLC | Lane Bryant 6618, LLC |
| Fashion Bug #2658, Inc. | Lane Bryant #6480, Inc. | Lane Bryant #6623, Inc. |
| Fashion Bug #2659, Inc. | Lane Bryant #6485, LLC | Lane Bryant 6625, Inc. |
| Fashion Bug #2661 of Lakewood, Inc. | Lane Bryant #6498, LLC | Lane Bryant #6637, LLC |
| Fashion Bug #2663, Inc. | Lane Bryant #6510, Inc. | Lane Bryant #6644, LLC |
| Fashion Bug #2665, Inc. | Lane Bryant 6520, Inc. | Lane Bryant #6651, LLC |
| Fashion Bug #2667, Inc. | Lane Bryant #6531, LLC | Lane Bryant #6652, LLC |
| Fashion Bug #2671, Inc. | Lane Bryant #6545, Inc. | Lane Bryant #6654, LLC |
| Fashion Bug #2677, Inc. | Lane Bryant/Cacique #6553, LLC | Lane Bryant #6655, LLC |
| Fashion Bug #2679, Inc. | Lane Bryant #6557, LLC | Lane Bryant #6657, LLC |
| Fashion Bug #2680, Inc. | Lane Bryant 6559, Inc. | Lane Bryant #6659, LLC |
| Fashion Bug #2682, Inc. | Lane Bryant #6560, Inc. | Lane Bryant 6662, Inc. |
| Fashion Bug #2685, Inc. | Lane Bryant #6561, Inc. | Lane Bryant #6666 of Poughkeepsie, LLC |
| Fashion Bug #2688, Inc. | Lane Bryant #6572, LLC | Lane bryant #6668, LLC |
| Fashion Bug #2689, Inc. | Lane Bryant 6616, Inc. | Lane Bryant #6671, LLC |
| Fashion Bug #2695, Inc. | Lane Bryant #6622, LLC | Lane Bryant #6674, LLC |
| Fashion Bug #2697, Inc. | Lane Bryant 6642, Inc. | Lane Bryant #6679, LLC |
| Fashion Bug #2699, Inc. | Lane Bryant #6646, LLC | Lane Bryant #6680, LLC |
| Fashion Bug #2700 of Port Jefferson, Inc. | Lane Bryant #6658, LLC | Lane Bryant #6682, LLC |
| Fashion Bug #2701, Inc. | Lane Bryant #6681, LLC | Lane Bryant 6684, LLC |
| Fashion Bug #2707, Inc. | Lane Bryant #6693, LLC | Lane bryant #6685, LLC |
| Fashion Bug #2708, Inc. | Lane Bryant #6699, LLC | Lane Bryant #6686, LLC |
| Fashion Bug #2709, Inc. | Lane Bryant 6701, Inc. | Lane Bryant 6688, Inc. |
| Fashion Bug #2711, Inc. | Lane Bryant #6719, LLC | Lane Bryant #6690, LLC |
| Fashion Bug #2717, Inc. | Lane Bryant #6725, LLC | Lane Bryant #6692, LLC |
| Fashion Bug #2719, Inc. | Lane Bryant #6729, LLC | Lane Bryant #6696, LLC |
| Fashion Bug #2720, Inc. | Lane Bryant #6746, Inc. | Lane Bryant #6703, LLC |
| Fashion Bug #2721, Inc. | Lane Bryant #6755, LLC | Lane Bryant #6704, LLC |
| Fashion Bug #2722, Inc. | Lane Bryant #6758, LLC | Lane Bryant #6708, LLC |
| Fashion Bug #2724, Inc. | Lane Bryant #6767, LLC | Lane Bryant #6709, LLC |
| Fashion Bug #2727, Inc. | Lane Bryant #6771, LLC | Lane Bryant #6710, LLC |
| Fashion Bug #2729, Inc. | Lane Bryant #6796, LLC | Lane Bryant #6711, LLC |
| Fashion Bug #2730, Inc. | Lane Bryant #6803, Inc. | Lane Bryant #6721, LLC |

| | | |
|---|---|---|
| Fashion Bug #2731, Inc. | Lane Bryant #6809, LLC | Lane Bryant 6722, Inc. |
| Fashion Bug #2733, Inc. | Lane Bryant #6816, LLC | Lane Bryant #6740, LLC |
| Fashion Bug #2736, Inc. | Lane Bryant #6830, Inc. | Lane Bryant #6741, LLC |
| Fashion Bug #2737, Inc. | Lane Bryant #6836, Inc. | Lane Bryant #6743, LLC |
| Fashion Bug #2738, Inc. | Lane Bryant #6850, Inc. | Lane Bryant #6745, LLC |
| Fashion Bug #2739 of Rotterdam, Inc. | Lane Bryant #6862, Inc. | Lane Bryant #6750 of East Northport, LLC |
| Fashion Bug #2740, Inc. | Lane Bryant #6873, Inc. | Lane Bryant #6756, LLC |
| Fashion Bug #2741, Inc. | Lane Bryant #6877, LLC | Lane Bryant #6759, LLC |
| Fashion Bug #2749, Inc. | Lane Bryant 6889, Inc. | Lane Bryant #6760, LLC |
| Fashion Bug #2750, Inc. | Lane Bryant #6892, LLC | Lane Bryant #6763, LLC |
| Fashion Bug #2751, Inc. | Lane Bryant #6896, LLC | Lane Bryant #6765, LLC |
| Fashion Bug #2759, Inc. | Lane Bryant #6905, LLC | Lane Bryant #6766, LLC |
| Fashion Bug #2763, Inc. | Lane Bryant 6927, Inc. | Lane Bryant #6772, LLC |
| Fashion Bug #2766, Inc. | Lane Bryant #6937, LLC | Lane Bryant #6773, LLC |
| Fashion Bug #2767, Inc. | Lane Bryant/Cacique #6944, LLC | Lane Bryant #6778, LLC |
| Fashion Bug #2768, Inc. | Lane Bryant #6948, LLC | Lane Bryant #6782, LLC |
| Fashion Bug #2769, Inc. | Lane Bryant #6960, LLC | Lane Bryant #6785, Inc. |
| Fashion Bug #2775, Inc. | Petite Sophisticate #7301, LLC | Lane Bryant #6786, LLC |
| Fashion Bug #2779, Inc. | Petite Sophisticate #7307, LLC | Lane Bryant #6788, LLC |
| Fashion Bug #2781, Inc. | Petite Sophisticate #7308, LLC | Lane Bryant 6789, Inc. |
| Fashion Bug #2787, Inc. | Petite Sophisticate #7309, LLC | Lane Bryant #6792 of Brooklyn, LLC |
| Fashion Bug #2789, Inc. | Petite Sophisticate #7310, LLC | Lane Bryant #6794, Inc. |
| Fashion Bug #2791, Inc. | Fashion Bug Plus #8019, Inc. | Lane Bryant #6804, LLC |
| Fashion Bug #2794, Inc. | Fashion Bug Plus #8040, Inc. | Lane Bryant #6808, LLC |
| Fashion Bug #2795, Inc. | Fashion Bug Plus #8041, Inc. | Lane Bryant #6812, LLC |
| Fashion Bug #2796 of Cobleskill, Inc. | Fashion Bug Plus #8047, Inc. | Lane Bryant #6817 of Buffalo, LLC |
| Fashion Bug #2797, Inc. | Fashion Bug Plus #8048, Inc. | Lane Bryant #6823, LLC |
| Fashion Bug #2802, Inc. | Fashion Bug Plus #8051, Inc. | Lane Bryant #6828 of Middletown, LLC |
| Fashion Bug #2807, Inc. | Fashion Bug Plus #8057, Inc. | Lane Bryant #6832, LLC |
| Fashion Bug #2811, Inc. | Fashion Bug Plus #8060, Inc. | Lane Bryant #6833, LLC |
| Fashion Bug #2820, Inc. | Fashion Bug Plus #8062, Inc. | Lane Bryant #6853, LLC |
| Fashion Bug #2821, Inc. | Fashion Bug Plus #8067, Inc. | Lane Bryant #6854, LLC |
| Fashion Bug #2822, Inc. | Fashion Bug Plus #8078, Inc. | Lane Bryant #6856, LLC |
| Fashion Bug #2826, Inc. | Fashion Bug Plus #8079, Inc. | Lane Bryant #6859, Inc. |

| | |
|---|---|
| Fashion Bug #2828, Inc. | Lane Bryant 6861, Inc. |
| Fashion Bug Plus #8080, Inc. | Lane Bryant 6861, Inc. |
| Fashion Bug #2829, Inc. | Lane Bryant #6864, LLC |
| Lane Bryant Outlet #4101 of Waterloo, LLC | Lane Bryant #6864, LLC |
| Fashion Bug #2838, Inc. | Lane Bryant #6875, LLC |
| Lane Bryant Outlet #4104, LLC | Lane Bryant #6875, LLC |
| Fashion Bug #2841, Inc. | Lane Bryant 6878, LLC |
| Lane Bryant Outlet #4105, LLC | Lane Bryant 6878, LLC |
| Fashion Bug #2842, Inc. | Lane Bryant #6879, LLC |
| Lane Bryant Outlet 4106, Inc. | Lane Bryant #6879, LLC |
| Fashion Bug #2844, Inc. | Lane Bryant #6882, LLC |
| Lane Bryant Outlet #4107, LLC | Lane Bryant #6882, LLC |
| Fashion Bug #2850, Inc. | Lane Bryant #6883, LLC |
| Lane Bryant Outlet #4108, LLC | Lane Bryant #6883, LLC |
| Fashion Bug #2851, Inc. | Lane Bryant #6891, LLC |
| Lane Bryant Outlet #4109, LLC | Lane Bryant #6891, LLC |
| Fashion Bug #2852, Inc. | Lane Bryant 6894, Inc. |
| Lane Bryant Outlet #4112, LLC | Lane Bryant 6894, Inc. |
| Fashion Bug #2853 of Rome, Inc. | Lane Bryant #6895, LLC |
| Lane Bryant Outlet #4113, LLC | Lane Bryant #6895, LLC |
| Fashion Bug #2855, Inc. | Lane Bryant #6898, LLC |
| Lane Bryant Outlet #4115, LLC | Lane Bryant #6898, LLC |
| Fashion Bug #2857, Inc. | Lane Bryant #6899, LLC |
| Lane Bryant Outlet #4116, LLC | Lane Bryant #6899, LLC |
| Fashion Bug #2858, Inc. | Lane Bryant #6901, LLC |
| Lane Bryant Outlet #4120 of Lake George, LLC | Lane Bryant #6901, LLC |
| Fashion Bug #2863, Inc. | Lane Bryant #6907, Inc. |
| Lane Bryant Outlet #4121, LLC | Lane Bryant #6907, Inc. |
| Fashion Bug #2864, Inc. | Lane Bryant #6910 of Bayside, LLC |
| Lane Bryant Outlet #4123, LLC | Lane Bryant #6910 of Bayside, LLC |
| Fashion Bug #2868, Inc. | Lane Bryant #6915, LLC |
| Lane Bryant Outlet #4124, LLC | Lane Bryant #6915, LLC |
| Fashion Bug #2869, Inc. | Lane Bryant #6916, LLC |
| Lane Bryant Outlet #4129, LLC | Lane Bryant #6916, LLC |
| Fashion Bug #2871 of Albany, Inc. | Lane Bryant #6917, LLC |
| Lane Bryant Outlet #4131, LLC | Lane Bryant #6917, LLC |
| Fashion Bug #2872, Inc. | Lane Bryant 6918, Inc. |
| Lane Bryant Outlet #4132, LLC | Lane Bryant 6918, Inc. |
| Fashion Bug #2874, Inc. | Lane Bryant 6919, Inc. |
| Lane Bryant Outlet #4136, LLC | Lane Bryant 6919, Inc. |
| Fashion Bug #2879, Inc. | Lane Bryant #6931, LLC |
| Lane Bryant Outlet #4137, LLC | Lane Bryant #6931, LLC |
| Fashion Bug #2886, Inc. | Lane Bryant #6933, LLC |
| Lane Bryant Outlet #4138, LLC | Lane Bryant #6933, LLC |
| Fashion Bug #2894, Inc. | Lane Bryant #6936, LLC |
| Lane Bryant Outlet #4139, LLC | Lane Bryant #6936, LLC |
| Fashion Bug #2898, Inc. | Lane Bryant #6939, LLC |
| Lane Bryant Outlet #4141, LLC | Lane Bryant #6939, LLC |
| Fashion Bug #2905, Inc. | Lane Bryant #6943, LLC |
| Lane Bryant Outlet #4142, LLC | Lane Bryant #6943, LLC |
| Fashion Bug #2906, Inc. | Lane Bryant #6945 of Henrietta, LLC |
| Lane Bryant Outlet #4143, LLC | Lane Bryant #6945 of Henrietta, LLC |
| Fashion Bug #2907, Inc. | Lane Bryant/Cacique #6948, LLC |
| Lane Bryant Outlet #4145, LLC | Lane Bryant/Cacique #6948, LLC |
| Fashion Bug #2909, Inc. | Lane Bryant #6955, LLC |
| Lane Bryant Outlet #4146, LLC | Lane Bryant #6955, LLC |
| Fashion Bug #2911, Inc. | Lane Bryant #6957, LLC |
| Lane Bryant Outlet #4148, LLC | Lane Bryant #6957, LLC |
| Fashion Bug #2913, Inc. | Lane Bryant #6962 of Valley Stream, LLC |
| Lane Bryant Outlet #4149, LLC | Lane Bryant #6962 of Valley Stream, LLC |
| Fashion Bug #2915, Inc. | Lane Bryant/Cacique #6963 of West Nyack, LLC |
| Lane Bryant Outlet #4150, LLC | Lane Bryant/Cacique #6963 of West Nyack, LLC |
| Fashion Bug #2920, Inc. | Lane Bryant 6966, Inc. |
| Lane Bryant Outlet #4151, LLC | Lane Bryant 6966, Inc. |
| Fashion Bug #2922, Inc. | Lane Bryant #6968, LLC |
| Lane Bryant Outlet #4153, LLC | Lane Bryant #6968, LLC |

Case 1:13-cv-03477-AKH   Document 1   Filed 05/23/13   Page 79 of 79
EXHIBIT A

| | |
|---|---|
| Fashion Bug #2923 of Amsterdam, Inc. | Lane Bryant Outlet #4155, LLC |
| Fashion Bug #2924, Inc. | Lane Bryant Outlet #4156, LLC |
| Fashion Bug #2928, Inc. | Lane Bryant Outlet #4158 of Deer Park, LLC |
| Fashion Bug #2930, Inc. | Lane Bryant Outlet #4159, LLC |
| Fashion Bug #2932, Inc. | Lane Bryant Outlet #4161, LLC |
| Fashion Bug #2934, Inc. | Lane Bryant Outlet #4163 of Olean, LLC |
| Fashion Bug #2941, Inc. | Lane Bryant Outlet #4165, LLC |

| | |
|---|---|
| Lane Bryant #6974, LLC | |
| Lane Bryant #6979, LLC | |